**IN THE SUPREME COURT OF MISSISSIPPI**

**NO. 1998-CA-01596-SCT**

*KENNETH HERRING*

*v.*

*JOSEPH POIRRIER*

| | |
|---|---|
| DATE OF JUDGMENT: | 08/07/1998 |
| TRIAL JUDGE: | HON. JOHN H. WHITFIELD |
| COURT FROM WHICH APPEALED: | HARRISON COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | JAMES K. WETZEL |
| | MARIANO J. BARVIE' |
| ATTORNEY FOR APPELLEE: | ROBERT W. ATKINSON |
| NATURE OF THE CASE: | CIVIL - PERSONAL INJURY |
| DISPOSITION: | AFFIRMED- 07/27/2000 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**SMITH, JUSTICE, FOR THE COURT:**

¶1. This case comes to this Court on appeal from the Circuit Court of Harrison County, First Judicial District, where the jury returned a verdict for Kenneth Earl Herring but awarded him no monetary damages in his personal injury action against Joseph Poirrier.

¶2. After review, we find no reversible error and affirm the judgment of the circuit court.

**STATEMENT OF FACTS**

¶3. On November 18, 1994, the Dodge Ram pick-up truck driven by Kenneth Herring was struck from behind by the Nissan Altima driven by Joseph Poirrier at a stop light on Highway 49. Five to ten seconds after Poirrier struck Herring, a third vehicle, driven by Raymond Jefferson, struck Poirrier, and Poirrier's vehicle again struck Herring's truck. Herring allegedly hit his head on the back window of his truck but felt no pain or symptoms of injury at the scene of the accident. He told the officer at the scene that he was not injured, and he drove his truck away from the scene of the accident. Two weeks after the accident, Herring allegedly began experiencing pain in his lower back, left hip, and left leg.

¶4. Herring filed this personal injury action in the Circuit Court of Harrison County, First Judicial District, on January 7, 1997. Herring subsequently settled his claim with Jefferson, and the claim against Poirrier proceeded to trial, Poirrier having stipulated to his negligence. The evidence adduced at trial consisted of the testimony of Herring, Poirrier, Dr. Harry A. Danielson, expert in neurosurgery offered by Herring and

Herring's treating physician, and Dr. Ronald Graham, expert in orthopedic surgery offered by Poirrier. Both physicians testified by deposition. The testimony regarding Herring's medical condition went as follows.

¶5. Herring had a long-standing history of back problems prior to the accident in question. Herring testified that in 1979 he injured his back at work and that he ultimately had surgery for the injury in 1985. Dr. Ronald A. Graham, an orthopedic surgeon offered by Poirrier as an expert in orthopedics and orthopedic surgery, testified that, though he had never treated Herring, he had reviewed Herring's medical records, both before and after the accident, the accident reports and photographs of the scene of the accident, as well as the depositions of Herring and Poirrier. Dr. Graham stated that, according to Herring's medical records, in 1985 Herring saw Dr. Richard Konn at Forrest General Hospital in Hattiesburg and complained of right leg pain. The examination conducted by Dr. Konn indicated that Herring suffered from an L5/S1 radiculopathy, or a disease of the nerve root. Herring also saw Dr. Ralph Wicker, a neurosurgeon, in 1985 complaining of right leg pain. Dr. Wicker found that the right nerve root was cut off at the L5/S1 disk, and in February 1985, Dr. Wicker performed a semi-hemilaminectomy, or a laminotomy, at the L5/S1 level. Herring testified that, after the surgery in 1985, he had no more back pain or further injuries to his back until two weeks after the accident on November 18, 1994.

¶6. Herring testified that he began feeling pain in his back, left hip, and left leg about two weeks after the accident in question. He testified that he first sought treatment from an orthopedist, Dr. Williford, in December 1994. Herring testified that Dr. Williford recommended that Herring see a neurosurgeon. Dr. Harry A. Danielson, a neurosurgeon and Herring's treating physician after the 1994 accident, was offered as Herring's expert in the field of neurosurgery. Dr. Danielson first examined Herring on February 1, 1995. At that time, Herring was complaining of pain in his back, left hip, and left leg. The pain, however, was not hindering Herring's ability to work. Dr. Danielson testified that, upon his initial examination of Herring, there was no objective proof that Herring's injuries were attributable to the accident. Dr. Danielson testified that his examination of Herring did not confirm Herring's complaints. He stated that Herring lacked some range in left leg motion and had some loss of sensitivity in the small toes of his left foot. Dr. Danielson stated that the numbness in the small toe was attributable to Herring's preexisting problems, not the accident. Dr. Danielson recommended that Herring undergo an MRI scan as well as physical therapy.

¶7. Herring testified that, though he had no previous problems with claustrophobia, claustrophobia prevented his undergoing the MRI. He indicated such to Dr. Danielson, and Dr. Danielson prescribed valium to assist Herring with the MRI scan. Herring attended two of the physical therapy sessions prescribed by Dr. Danielson, but testified that he attended no further sessions, though they were prescribed, because the rooms the sessions were conducted in were small and his claustrophobia prevented him from attending the sessions. Dr. Danielson testified that Herring never informed him that he had stopped going to the physical therapy sessions.

¶8. Dr. Danielson stated that the MRI showed degeneration of disks L2/3 through L5/S1. Dr. Danielson testified that this degeneration was not due to the accident, but that the condition may come about through the wear and tear of the aging process. He explained that this degeneration may cause pain, stiffness, and other symptoms even where no accident has occurred. Dr. Danielson stated that he advised Herring that he should schedule another appointment soon, but that he did not see Herring again until the following year in January 1996.

¶9. Dr. Danielson performed a myelogram and CT scan in January 1996, and at that time diagnosed

Herring as having a herniated L3/4 disk. Dr. Danielson stated that this degeneration was not due to the 1994 accident. Again, Dr. Danielson testified that he advised Herring to schedule another appointment in four to six weeks, but that he did not see Herring again until July 1996. In July 1996, Herring complained, for the first time, of pain down his right leg. Dr. Danielson recommended a procedure called a percutaneous discectomy for the purpose of correcting the pain in the right leg. Dr. Danielson recommended that Herring return in two months. However, Herring did not return to Dr. Danielson until the day the surgery was scheduled in January 1998, a year and a half later. Dr. Danielson performed a percutaneous diskectomy in January 1998 to correct the pain down the right leg. Dr. Danielson stated that the surgery was performed without the benefit of an examination.

¶10. Dr. Danielson stated that in May 1998, Herring was still experiencing tingling and numbness in his left leg, so Dr. Danielson performed another myelogram and CT scan. Dr. Danielson stated that the tests showed that Herring had a central disk protrusion at L4/5. Dr. Danielson stated that he saw no problem at L4/5 on Herring's earlier visits, but that the radiology report dated February 1995 indicated anular tearing at L4/5, but no herniation. Dr. Danielson stated that, as treatment for such, he would prefer to recommend exercises, but, as a last resort, would perform a laminotomy at L4/5.

¶11. When asked whether the accident in question contributed to Herring's injuries, Dr. Danielson stated that, based upon the reliability of the history given him by Herring, the injury is consistent with a disk herniation, but not with the degenerative condition which existed prior to the accident. Dr. Danielson stated that, in the absence of an undisclosed accident between the prior surgery and the injury at L4/5 now suffered by Herring, that the accident in question would "set the landscape" for Herring's injuries. However, Dr. Danielson also testified that disk protrusions can occur spontaneously. Dr. Danielson stated that he relies on the history given by the patient to tie an injury to a specific accident. He testified that he had no records of the procedure performed in 1985 by Dr. Wicker. Dr. Danielson testified that it is the patient's responsibility to follow through with the recommended treatment. He stated that he would not recommend surgery for Herring had he known that Herring had not complied with his recommendations regarding the physical therapy and that Herring's failure to comply with his instructions could impair Herring's ability to recover without the necessity of surgery. Dr. Danielson stated that he did not know that there were two impacts on the date of the accident in question or any details of the accident such as the severity of the impacts, the amount of damage to the vehicles involved, or what happened to Herring's body inside his truck.

¶12. At the time of trial, Herring had incurred medical bills in the amount of $21,997.18 since the 1994 accident. Dr. Danielson stated that the cost of the future surgery, a laminotomy, is roughly $20,000, with hospitalization of two to three days and rest for three to six weeks. He stated that the degree of permanent impairment without surgery would be ten to fifteen percent.

¶13. Dr. Graham testified that his review of Herring's medical records and the tests performed by Dr. Danielson reveal that Herring has a degenerative joint disease in his facet joints, normal in aging individuals, related to factors such as age, height and weight. He stated that the tests reveal a decreased disk height throughout the lumbar spine indicating that Herring is beginning to have some drying out of his disks. He stated that Herring has large joint spurs at L3/4, indicating degenerative disease in the lower back. He stated that Herring has some degenerative arthritis as well as scoliosis, a lateral bending of the spine, which is most significant in the area of disk L3/4. Dr. Graham testified that with regard to the degenerative joint disease, the scoliosis, and the joint spurs, in his opinion to a matter of medical probability, those conditions

would not relate to the accident in question. Dr. Graham testified that there is no evidence of a single traumatic event such as a fracture, soft tissue swelling from bleeding, large herniation of a disk, or anything of an acute nature that he would relate to the accident. He stated that, in light of Herring's medical records, any injury that would result from the 1994 accident would strictly be a soft tissue injury such as a low back soft tissue strain, but that the tests run by Dr. Danielson indicate that there is no structural damage. He stated that the protrusion at L3/4 is not pathology, but rather represents the drying out of the disk and sagging of the annular ligament around the disk, a normal process of aging. Dr. Graham explained that the healing time for a soft tissue injury, whether it be from an athletic injury or car accident, is eight weeks in a person of good nutrition. He stated that the recommended treatment for a soft tissue injury is a limitation on weight lifting and prescription of anti-inflammatories and drugs to decrease the discomfort of muscle spasms, all to be followed up with physical therapy. He stated that there would be no permanent impairment.

¶14. Dr. Graham testified that Herring's medical record concerns him for the following reasons. Herring saw Dr. Williford, a physician in Hattiesburg, complaining of pain in the left leg, but had a normal neurological exam with no deficit. Herring then saw Dr. Danielson for pain in the left leg, and the neurological exam supported a problem on the left. Herring's complaints of pain then switched to the right leg, and Dr. Danielson recommended a percutaneous diskectomy without an intervening physical examination. Eighteen months later, Dr. Danielson performed the recommended surgery to correct the pain on the right side. However, there was no repeat physical examination prior to the recommendation of surgery. Dr. Graham explained that back surgery is not performed for mere pain and that surgeons do not open up a patient's back to "have a look." Rather, Dr. Graham stated, the pain complained of must match problems on the physical examination before the surgery is performed. In this case, the surgery performed by Dr. Danielson in 1998 did not match the results of the examination performed in 1995. Dr. Graham testified that there is no objective evidence presented in Herring's medical record that surgery was required as a result of the accident in question.

¶15. On July 30, 1998, the jury returned a verdict in favor of Herring and assessed damages at $0. The trial court entered judgment on the verdict on August 8, 1998. On August 10, 1998, Herring filed a Motion for Additur or, in the alternative, Motion for New Trial. The Honorable John H. Whitfield, Circuit Court Judge, denied Herring's motion on October 5, 1998. On October 16, 1998, Herring timely filed a notice of appeal, raising the following issues:

**I. THE TRIAL COURT ERRED BY ALLOWING DEFENSE COUNSEL TO CROSS-EXAMINE HERRING REGARDING HIS REFUSAL TO SUBMIT TO AN INDEPENDENT MEDICAL EXAMINATION AND BY GRANTING THE JURY INSTRUCTION D-5, REGARDING THE SAME.**

**II. THE TRIAL COURT ERRED BY ALLOWING DEFENSE COUNSEL TO QUESTION HERRING REGARDING HIS USE OF A SEAT BELT IN ORDER TO MITIGATE MEDICAL DAMAGES.**

**III. THE TRIAL COURT ERRED BY GRANTING JURY INSTRUCTION D-3.**

**IV. THE TRIAL JUDGE ERRED AS A MATTER OF LAW BY DENYING HERRING'S MOTION FOR ADDITUR, OR IN THE ALTERNATIVE, FOR A NEW TRIAL ON DAMAGES, INASMUCH AS THE JURY VERDICT WAS CONTRARY TO THE**

**OVERWHELMING WEIGHT OF THE EVIDENCE.**

## DISCUSSION OF LAW

**I. THE TRIAL COURT ERRED BY ALLOWING DEFENSE COUNSEL TO CROSS-EXAMINE HERRING REGARDING HIS REFUSAL TO SUBMIT TO AN INDEPENDENT MEDICAL EXAMINATION AND BY GRANTING THE JURY INSTRUCTION D-5, REGARDING THE SAME.**

¶16. Herring argues that the trial court erred by allowing Poirrier's attorney to question Herring regarding his refusal to submit to an independent medical examination by a physician chosen by Poirrier's counsel, or, alternatively, by the court. Over the objection of James K. Wetzel, Herring's attorney, the circuit court allowed Robert W. Atkinson, counsel for Poirrier, to inquire as follows of Herring on cross-examination:

Q. Isn't it true, sir, that you were offered the chance to have an independent medical examination by another doctor at no expense to you?

A. I don't remember that.

MR. ATKINSON: May I approach the witness, Your Honor?

THE COURT: Yes.

Q. Do you recall answering interrogatories in this matter?

A. Yes.

Q. Written questions to you, correct?

A. Correct.

Q. And you reviewed the questions and then you gave answers to them under oath?

A. Yes.

Q. And you signed the interrogatories in the presence of a notary?

A. Correct.

Q. Let me read to you Interrogatory Number 21 and your answer, and tell me if I'm reading this wrong, please.

MR. WETZEL: May I have an ongoing objection, Your Honor?

THE COURT: Yes, you may.

Q. "Will you agree to an independent medical examination at the expense of this defendant and conducted by a physician of his own choosing?" Your answer was, "No," correct?

A. That's what the - what it says.

Q. That is what it says, and that is your signature?

A. Yes.

Q. And in front of a notary?

A. (Nods head affirmatively.)

Q. All right. Then -

THE COURT: Is that "Yes"?

A. Yes.

Q. The next question, Interrogatory -

MR. WETZEL: He's already answered the question. He's already answered the question.

MR. ATKINSON: I said, "The next question."

MR. WETZEL: The question he's going to ask him now is cumulative to the first one.

MR. ATKINSON: Your Honor, -

THE COURT: I'll overrule the objection. Go ahead.

Q. Next question, Number 22: "Will you agree to an independent medical examination at the expense of this defendant and conducted by a physician duly appointed by the Court of record in this case?" And your answer was "No," correct?

A. Correct.

MR. WETZEL: Same objection, Your Honor.

THE COURT: So noted. Overruled.

Q. You read those questions?

A. Yes.

Q. You provided those answers?

A. It says I did.

Q. You don't deny that.

A. I don't deny it, no.

¶17. Herring's refusal to submit to an independent medical examination was brought before the jury at other times during the trial. During closing arguments, Poirrier's attorney reiterated Herring's refusal to submit to an independent medical examination and stated:

You tell me why, if the plaintiff was hurt as badly as he claims, that he would refuse to submit to an independent medical examination free of charge. . . . Ladies and gentlemen, to hide, to hide behind the cover of darkness, to not expose yourself to being reviewed, I don't think there's any basis in the world for that when you're offered a chance for a second opinion. And you know what? Heavens, he's claiming that four years after the accident, he's still not doing well, not doing any better really. I would think he would be more than happy to accept a second opinion as to what his condition is and what he ought to do about it, because heavens, Dr. Danielson hasn't done him a bit of good.

Also, the court granted instruction D-5, which provided as follows:

The Court instructs the jury that under the laws of the State of Mississippi, a Defendant such as Joseph Poirrier cannot compel a Plaintiff such as Kenneth Herring to be seen by another doctor for a second opinion. The Court instructs the jury that the only way that Kenneth Herring could have been seen by another doctor for a second opinion, at the request of Joseph Poirrier, was for the Plaintiff to have consented to such request.

¶18. This Court's standard of review of the trial court's admission or exclusion of evidence is the abuse of discretion standard. *Thompson Mach. Commerce Corp. v. Wallace*, 687 So. 2d 149, 152 (Miss.1997); *Wade v. State*, 583 So. 2d 965, 967 (Miss. 1991). As both parties recognize, the Mississippi Rules of Civil Procedure do not give the court the authority to order a party whose physical or mental condition is in controversy to submit to an independent medical examination. *Swan v. I.P., Inc.*, 613 So. 2d 846, 858 (Miss. 1993). Herring contends that the question of whether he refused to submit to independent medical examination is irrelevant to the issues in the lawsuit and that the trial court's allowing the questioning on cross-examination was prejudicial error. Herring also contends that the trial court's granting of instruction D-5 inappropriately gave undue prominence to the questioning and amplified the error.

¶19. Poirrier argues that his attorney was entitled to question Herring regarding his refusal to submit to an independent medical examination because Herring's attorney "opened the door" to the questions by commenting during opening statements on the failure of Poirrier's medical expert, Dr. Graham, to examine Herring. During opening statements, Herring's attorney commented that the only evidence that Poirrier could submit pertaining to medical evidence would come from a doctor who did not personally examine Herring. This Court has held that comments during opening statements may open the door for evidence to rebut the same. *Florence v. State*, 755 So. 2d 1065, 1070-72 (Miss. 2000) (defendant's attorney opened the door during opening statements by denying any homosexual tendencies and the introduction of extrinsic evidence to rebut those statements was held as relevant and not unfairly prejudicial). Herring may not make comments during opening statements and then complain when the opposing party attempts to respond to them.

¶20. Here, Herring sought to discredit Poirrier's medical expert by pointing out that the expert had not examined Herring. On the other hand, Herring wanted to keep from the jury the fact that he did not submit to an examination by Poirrier's expert. This a litigant is not permitted to do. Accordingly, the questioning and comment regarding Herring's refusal to submit to a medical examination were properly admitted.

**II. THE TRIAL COURT ERRED BY ALLOWING DEFENSE COUNSEL TO QUESTION HERRING REGARDING HIS USE OF A SEAT BELT IN ORDER TO MITIGATE MEDICAL DAMAGES.**

¶21. Herring argues that the trial court erred by allowing defense counsel to question him regarding his use of a seat belt at the time of the accident in question. Subsequent to asking Herring about the damage caused to his truck by the first and second impacts, defense counsel asked as follows:

Q. Now, let's talk about what happened to you inside your truck. You had your seat belt on?

A. Correct.

Q. And the seat belt remained intact, correct?

A. Correct.

¶22. Herring's attorney objected to this line of questioning, stating that questions regarding the use or non-use of seat belts to mitigate damages is impermissible. Defense counsel stated that the questions were simply designed to show that Herring had his seat belt on and, therefore, was not thrown about in the car. The trial judge overruled the objection of Herring's attorney, and the questioning proceeded:

Q. Back to where we were, you said you had your seat belt on, correct?

A. Correct.

Q. All right. And, in fact, your seat belt remained intact; it did not come apart or anything?

***

A. Correct.

Q. In fact, you remained in your seat throughout the accident.

A. Yes.

Q. Now, you testified earlier on your direct exam that as a result of the first impact, that your head, the back of your head, came in contact with the rear window of your truck.

A. Correct.

Q. The fact of the matter is, that's the only part of your body that came in contact with anything inside of your car as of that first impact, correct?

A. Correct.

¶23. Herring argues that because Miss. Code Ann. § 63-2-3 (1996) prohibits a defendant from questioning a plaintiff regarding his non-use of a seat belt, this Court should likewise prohibit a defendant from questioning a plaintiff regarding his use of a seat belt. Herring contends that such a prohibition is consistent with the purpose of § 63-2-3.

¶24. Herring's argument is without merit. Section 63-2-3 provides:

This chapter shall not be construed to create a duty, standard of care, right or liability between the operator and passenger of any passenger motor vehicle which is not recognized under the laws of the State of Mississippi as such laws exist on the date of passage of this chapter or as such laws may at

any time thereafter be constituted by statute or court decision. Failure to provide and use a seat belt restraint device or system shall not be considered contributory or comparative negligence, nor shall the violation be entered on the driving record of any individual.

The statute provides that failure to use a seat belt may not be considered as evidence of contributory or comparative negligence. It does not purport to bar the admission of seat belt non-usage in all cases, as Herring asserts, but rather forbids such only from being considered as contributory or comparative negligence. *See Estate of Hunter v. General Motors Corp.*, 729 So. 2d 1264, 1267-68 (Miss. 1999). Furthermore, the statute does not provide that the use of a seat belt may not be considered. This Court has stated that § 63-2-3 should be enforced as written and is not given an overbroad application, lest the statute be considered an improper evidentiary statute rather than a substantive one. *Id.* at 1268 (noting that there can be no statutory rule of evidence). Herring's interpretation of § 63-2-3 improperly expands the language of the statute to prohibit not only evidence of seat belt non-usage in all instances, but also evidence of the use of a seat belt offered for any purpose.

¶25. In the case at hand, Poirrier stipulated to his negligence. The only issues before the jury were whether Poirrier's negligence caused Herring's injuries and, if so, to what extent. The testimony elicited from Herring on cross-examination is relevant to both issues - that is, whether Herring remained in his seat upon impact is relevant to whether Herring sustained injuries from the impact as well as to the extent of those injuries. Furthermore, Herring testified that he was wearing his seat belt at the time of the accident. A jury could not misuse this information to conclude that Herring was somehow contributorily negligent. In fact, the fact that Herring was wearing his seatbelt would tend to prove just the opposite. The trial judge did not err in allowing defense counsel to question Herring regarding his use of a seat belt.

### III. THE TRIAL COURT ERRED BY GRANTING JURY INSTRUCTION D-3.

¶26. Herring contends that the trial court erred in granting jury instruction D-3, which provided as follows:

You are instructed that a plaintiff is under a duty after suffering harm, if any, to exercise due care and to take reasonable steps to avoid or diminish the damages resulting from that harm. You are further instructed that a plaintiff is not entitled to recover damages for the harm that he could have avoided by the use of due care, nor for the harm which proximately resulted from his own conduct, if any, which contributed to his damages.

If you find from a preponderance of the evidence in this case that Kenneth Herring was instructed by his physician to take certain steps in an attempt to treat the medical conditions which he, Kenneth Herring, claims resulted from the accident of November 18, 1994, and if you further find that Kenneth Herring failed to follow his physician's instructions in that regard, and if you further find that such failure on the part of Kenneth Herring, if any, caused him to endure certain medical conditions or incur certain bills that he otherwise would have avoided by following his physician's instructions, then you are instructed that Kenneth Herring is not entitled to recover damages for those medical conditions and/or medical bills that he would have avoided by following his physician's instructions.

¶27. A jury instruction may not be given unless it is supported by some evidentiary basis in the record. *Perry v. State*, 637 So. 2d 871, 877 (Miss.1994); *Gayle v. State*, 743 So. 2d 392, 401 (Miss.Ct.App. 1999). Herring asserts that this instruction should not have been allowed because it was not supported by the evidence introduced. During the charge conference, Herring's attorney argued that there was no

testimony that Herring failed to mitigate his damages and also that there was no testimony that Herring's injuries had been augmented or prolonged or more medical bills had been incurred because Herring failed to follow through with the physical therapy recommendations by Dr. Danielson.

¶28. Herring's argument is without merit. As Poirrier asserts, there was ample evidence at trial to support the above instruction. There was a significant amount of evidence that Herring disregarded the advice of his physician, Dr. Danielson. Herring testified that during his first examination by Dr. Danielson, Dr. Danielson prescribed nine sessions of physical therapy. Herring testified that he went to no more than three of the sessions because he suffers from claustrophobia and the therapy rooms were too small. Herring testified that Dr. Danielson again prescribed physical therapy in January 1996 and that he did not attend the sessions. Herring stated that he informed Dr. Danielson that he was unable to attend the therapy sessions. Herring testified that Dr. Danielson prescribed physical therapy a third time in February 1998 and that Herring again told Dr. Danielson he could not attend the sessions. However, Dr. Danielson testified that Herring never informed him that he had stopped going to the physical therapy sessions.

¶29. Herring's assertion that there was no evidence that Herring's injuries were augmented or prolonged or that more medical bills had been incurred because of his failure to continue with the physical therapy sessions is erroneous. At the time of the trial, Herring had already undergone one surgery, and Dr. Danielson had recommended that he undergo another in the future. Included within the damages sought by Herring at trial were these medical bills. Dr. Danielson testified that he would not have recommended surgery for Herring had he known that Herring had not complied with his recommendations regarding the physical therapy. He also stated that Herring's failure to comply with his instructions could impair Herring's ability to recover without the necessity of surgery.

¶30. Other evidence existed that Herring failed to comply with Dr. Danielson's instructions. Herring testified that he did not take the pain medication prescribed by Dr. Danielson because it made him sleepy. Herring stated that he had testified during his deposition that he did not inform Dr. Danielson that he was not taking the medication and that he did not give Dr. Danielson an opportunity to prescribe another drug which might not have undesirable side effects.

¶31. Dr. Danielson stated that at Herring's first appointment in February 1995, he advised Herring that he should schedule another appointment soon, but that he did not see Herring again until the following year in January 1996. Dr. Danielson testified that he performed a myelogram and CT scan in January 1996, and at that time diagnosed Mr. Herring as having a herniated L3/4 disk. At that time, Dr. Danielson advised Herring to schedule another appointment in four to six weeks, but he did not see Herring again until July 1996. Herring testified that he did not return for an examination between the time Dr. Danielson recommended surgery in July 1996 to the date of the surgery in January 1998, even though Dr. Danielson testified that he advised Herring to return in two months for a re-examination.

¶32. Certainly, there was ample evidence introduced by Poirrier at trial to support the above instruction.

### IV. THE TRIAL JUDGE ERRED AS A MATTER OF LAW BY DENYING THE PLAINTIFF'S MOTION FOR ADDITUR, OR IN THE ALTERNATIVE, FOR A NEW TRIAL ON DAMAGES, INASMUCH AS THE JURY VERDICT WAS CONTRARY TO THE OVERWHELMING WEIGHT OF THE EVIDENCE.

¶33. This Court reviews for abuse of discretion when determining whether a trial court erred in refusing an

additur or a new trial. *Harvey v. Wall*, 649 So. 2d 184, 187 (Miss. 1995) (citing *Rodgers v. Pascagoula Pub. Sch. Dist.*, 611 So. 2d 942, 945 (Miss. 1992); *Odom v. Roberts*, 606 So. 2d 114, 118 (Miss. 1992); *Motorola Communications & Electronics, Inc. v. Wilkerson*, 555 So. 2d 713, 723 (Miss. 1989)). Because it is primarily the province of the jury to determine the amount of damages to be awarded, the award "will normally not 'be set aside unless so unreasonable in amount as to strike mankind at first blush as being beyond all measure, unreasonable in amount and outrageous.'" *Harvey*, 649 So. 2d at 187 (quoting *Rodgers*, 611 So. 2d at 945). This Court must view the evidence in the light most favorable to the defendant, giving him any favorable inferences that may reasonably drawn therefrom. *Id.*

¶34. In arguing that the trial court abused its discretion in refusing to grant him an additur or, in the alternative, a new trial on the issue of damages, Herring apparently takes for granted the jury's finding that Poirrier's negligence was the proximate cause of the Herring's injuries. Herring argues that this case is similar to *Williams v. Wiggins*, 285 So. 2d 163 (Miss. 1973), in which the jury was peremptorily instructed regarding the issues of negligence and proximate cause. The only question remaining for the jury's determination was whether Williams was injured and, if so, the ascertainment of damages. In the case at hand, however, the jury was peremptorily instructed as to Poirrier's negligence only. The jury was also instructed that in order to award damages to Herring, it must find that Poirrier's negligence must be a substantial factor in producing Herring's injuries. As the trial judge explained to Poirrier's attorney during the charge conference, the jury's refusal to award damages to Herring could be based either on the jury's finding that Herring was not injured or that the damages that Herring alleged were not caused by the accident.

¶35. Poirrier introduced evidence at trial from which the jury could reasonably conclude that Herring's alleged injuries were not caused by the 1994 accident. Not only did Dr. Graham, an expert in orthopedic surgery offered by Poirrier, testify to Herring's preexisting back problems, but he also testified that Herring's current problems were likely not a result of the accident in question. Dr. Graham stated that Herring's injuries were due to a degenerative joint disease, normal in aging individuals, related to factors such as age, height and weight.

¶36. There was also evidence from which the jury could reasonably conclude that Herring was not injured. Herring testified that two days after Dr. Danielson recommended surgery, which he ultimately underwent to put an end to, in his own words, "unbearable pain," Herring went on a six-day trip to Disney World. There was also evidence, discussed above, that Herring did not follow his physician's recommendations regarding physical therapy, use of pain medication, and doctor's visits. Herring's own expert and physician, Dr. Danielson, testified that, upon his initial examination of Herring, there was no objective proof that Herring's injuries were attributable to the accident. Dr. Danielson testified that his examination of Herring did not confirm Herring's complaints.

¶37. Dr. Danielson stated that, though the 1994 accident may have "set the landscape" for Herring's injuries, disk protrusions can occur spontaneously. He stated that he would not have recommended surgery for Herring had he known that Herring had not complied with his recommendations regarding the physical therapy and that Herring's failure to comply with his instructions could impair Herring's ability to recover without the necessity of surgery.

¶38. Herring contends that, pursuant to Miss. Code Ann. § 41-9-119 (1993), the proof that he incurred medical bills of $21,997.18 is prima facie evidence that the bills were necessary and reasonable. Herring

contends that these medical bills constituted a minimum floor upon which the jury should have assessed damages. However, as Herring also notes, an opposing party may rebut the necessity and reasonableness of the bills, and the ultimate question is for the jury to determine. *Jackson v. Brumfield*, 458 So. 2d 736, 737 (Miss. 1984). Poirrier put forth evidence, in the form of testimony from Dr. Graham, that the first surgery performed by Dr. Danielson was without the benefit of prior examination and that the reason for conducting the surgery, correction of pain in the right leg, did not match the results of the prior examination, which revealed problems with the left leg.

¶39. Furthermore, even if, pursuant to § 41-9-119, Herring's medical bills were necessary and reasonable, § 41-9-119 does not mandate a finding that those medical bills were incurred as a result of the accident in question. Again, there was evidence before the jury which raised a question as to whether the accident actually caused the injuries, if any, sustained by Herring.

¶40. Herring contends that, according to the testimony of Dr. Graham, he was injured a minimum of eight weeks as a result of the accident. Specifically, Herring refers to Dr. Graham's testimony that in the accident, Herring may have sustained a soft tissue injury such as a low back soft tissue strain. Dr. Graham explained that the healing time for a soft tissue injury is eight weeks in a person of good nutrition and that there would be no permanent impairment as the result of such an injury. Dr. Graham did not state that Herring actually sustained such an injury or that the records reviewed by him revealed the existence of such an injury. In fact, there was no evidence of a medical examination conducted during the eight-week period following the accident.

¶41. Herring also argues that the case sub judice is similar to *Brown v. Cuccia*, 576 So. 2d 1265 (Miss. 1991), in which this Court reversed the trial court's refusal to grant Brown's request for an additur. *Brown* is factually distinguishable from the case at hand in that the Court's decision in *Brown* rested on the fact that the medical evidence regarding Brown's injuries and the origin of those injuries was uncontradicted by the defendant, who put forth no evidence disputing the opinion of Brown's physician that Brown had suffered a disabling back injury as a result of the accident. In the case sub judice, the testimony of Dr. Danielson was disputed by Dr. Graham. Certainly, the weight accorded to differing opinions of experts is a question of fact for the jury. *Daniels v. GNB, Inc.*, 629 So. 2d 595, 602 (Miss. 1993) (citing *Ford Motor Co. v. Cockrell*, 211 So. 2d 833, 837 (Miss.1968)). And, again, it is primarily the province of the jury to determine the amount of damages to be awarded. *Harvey*, 649 So. 2d at 187 (quoting *Rodgers*, 611 So. 2d at 945). The jury's determination to award no damages to Herring was supported by evidence that the accident in question was not the proximate cause of Herring's alleged injuries, as well as evidence that Herring possibly was not injured at all. It cannot be said that the trial court abused its discretion in denying Herring's motion for additur or, in the alternative, for a new trial on the issue of damages.

## CONCLUSION

¶42. All issues raised by Herring are without merit. Therefore, the judgment of the circuit court is affirmed.

¶43. **AFFIRMED.**

**PRATHER, C.J., PITTMAN AND BANKS, P.JJ., MILLS, WALLER AND COBB, JJ., CONCUR. McRAE, J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY DIAZ, J.**

## McRAE, JUSTICE, DISSENTING:

¶44. The majority is incorrect in affirming the trial court's decision as the emphasis on Herring's refusal to submit to an independent medical examination clearly biased the jury. The lower court erred as a matter of law in allowing the Joseph (Poirrier's) counsel to introduce evidence and make closing arguments regarding Kenneth (Herring's) refusal of the exam. The court further compounded this error by allowing instruction D-5[1] which focused on that particular issue. Jury instruction D-3 was also erroneously allowed by the trial judge as it was confusing and could only have biased the jury. Accordingly, I dissent.

¶45. Jury instruction D-3 was a mitigation instruction instructing the jury that Herring had a duty to mitigate his damages by following physician's instructions and that if his failure to do so caused him to endure medical conditions or incur medical bills that he otherwise would not had he followed those instructions, then the jury was not to award any damages for those injuries.[2] First of all, the injuries and medical condition were caused by Poirrier's negligence, and the jury instruction completely exonerates his negligence for those injuries. Further, there was insufficient evidence presented that would support such an instruction to the jury. While the jury found for Herring and held that Poirrier was completely at fault when he slammed into the back of Herring's 1985 Dodge at a stop sign, it awarded Herring no damages. Jury instruction D-3 undoubtedly had an effect on the jury's decision as to damages. Such an instruction should not have been given in this case.

¶46. This Court in **Perry v. State**, 637 So.2d 871, 877 (Miss. 1994) stated that "[o]ur law is well-settled that jury instructions are not given unless there is an evidentiary basis in the record for such." (quoting **Fairchild v. State**, 459 So.2d 793, 800 (Miss.1984)). Such instructions "must be warranted by the evidence."**Monroe v. State**, 515 So.2d 860, 863 (Miss.1987)[3] and should not be indiscriminately granted. **Gangl v. State**, 539 So.2d 132, 136 (Miss.1989).

¶47. The physician who treated Herring, Dr. Danielson, testified that while Herring did suffer back problems prior to his accident, the disk herniation discovered after the accident was not consistent with his earlier ailments. However, the majority claims that testimony given by Dr. Danielson presented proper proof that Herring failed to mitigate his damages which prolonged his medical treatment. Dr. Danielson testified that Herring did not attend all of the physical therapy sessions as instructed.

¶48. However, the above mentioned testimony is not sufficient evidence of the potentially positive effects physical therapy could have had on Herring's condition to warrant a jury instruction. There is only testimony from Dr. Danielson, via a video-taped deposition, that he would not have recommended surgery had he known that Herring did not attend all of his therapy sessions and that Herring's failure to comply with his instructions *could* impair his ability to recover without surgery. There was no proof presented to show what Herring's condition would be had he attended all of the sessions. Nor was there any proof, that following all of Dr. Danielson's instructions would have cured his ailments. Instead, jury instruction D-3 allows the jury to essentially "play doctor" and decide whether it believes that Herring's medical condition could have been improved and costs lowered if he had followed all of his doctor's instructions. If Dr. Danielson himself cannot say for a certainty what effect therapy prior to surgery would have had on Herring's condition, then it is wrong for us to expect the jury to resolve such a complex issue.

¶49. The bottom line is that due Poirrier's to negligence, Herring was injured and required treatment, including back surgery. Herring should not be faulted for having to go through surgery and endure the pain and suffering of surgery and recuperation. What are future patients and litigants expected to do when they

receive conflicting recommendations from doctors as to proper treatment? Choose the least expensive and conservative one? The requirement of mitigating damages is more prevalent and more suitable in breach of contract settings than in personal injury cases. To allow jury instruction D-3 would be to imply that when conservative treatment is passed up for a more effective and costly surgery, a plaintiff has not "mitigated" his damages. That is wrong. This case should be reversed and remanded for a new trial.

¶50. Accordingly, I dissent.

### DIAZ, J., JOINS THIS OPINION.

1. "A Defendant such as Joseph Poirrier cannot compel a Plaintiff such as Kenneth Herring to be seen by another doctor for a second opinion. The Court instructs the jury that the only way that Kenneth Herring could have been seen by another doctor for a second opinion, at the request of Joseph Poirrier was for the Plaintiff to have consented to such a request."

2. "You are instructed that a plaintiff is under a duty after suffering harm, if any, to exercise due care and to take reasonable steps to avoid or diminish the damages resulting from that harm. You are further instructed that a plaintiff is not entitled to recover damages for the harm that he could have avoided by the use of due care, nor for the harm which proximately resulted from his own conduct, if any, which contributed to his damages.

If you find from a preponderance of the evidence in this case that Kenneth Herring was instructed by his physician to take certain steps in an attempt to treat the medical conditions which he, Kenneth Herring, claims resulted from the accident of November 18, 1994, and if you further find that Kenneth Herring failed to follow his physician's instructions in that regard, and if you further find that such failure on the part of Kenneth Herring, if any, caused him to endure certain medical conditions or incur certain bills that he otherwise would have avoided by following his physician's instructions, then you are instructed that Kenneth Herring is not entitled to recover damages for those medical conditions and/or medical bills that he would have avoided by following his physician's instructions."

3. Overruled on other grounds.