# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2011-CT-00089-SCT

*HONDA DOWNS AND ROBERT DOWNS*

*v.*

*PETER L. ACKERMAN*

## ON WRIT OF CERTIORARI

| | |
|---|---|
| DATE OF JUDGMENT: | 10/21/2010 |
| TRIAL JUDGE: | HON. ROBERT P. KREBS |
| COURT FROM WHICH APPEALED: | JACKSON COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANTS: | KENNETH M. ALTMAN |
| | MICHAEL SCOTT BISHOP |
| ATTORNEY FOR APPELLEE: | H. BENJAMIN MULLEN |
| NATURE OF THE CASE: | CIVIL - PERSONAL INJURY |
| DISPOSITION: | THE JUDGMENT OF THE COURT OF APPEALS IS REVERSED. THE JUDGMENT OF THE JACKSON COUNTY CIRCUIT COURT IS REINSTATED AND AFFIRMED - 06/20/2013 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**CHANDLER, JUSTICE, FOR THE COURT:**

¶1.     Honda Downs sued Dr. Peter Ackerman for injuries sustained in a motor-vehicle

collision when Dr. Ackerman rear-ended Downs. Dr. Ackerman admitted liability, and the

case went to trial on damages. The jury awarded Downs $20,000; the trial court denied

Downs's motion for an additur or a new trial. Downs appealed, and the Court of Appeals

found that the jury's verdict was the product of bias, passion, or prejudice and was against

the overwhelming weight of the evidence. The Court of Appeals reversed and remanded for an additur, or a new trial on damages if the additur was not accepted.

¶2. Dr. Ackerman filed a petition for a writ of certiorari, which we granted. We find that the trial court did not abuse its discretion by denying an additur or a new trial on damages. Therefore, we reverse the judgment of the Court of Appeals and reinstate and affirm the judgment of the trial court.

## FACTS

¶3. Downs worked as the manager of a clothing store. On September 7, 2007, Downs was traveling on Highway 90 in Ocean Springs, Mississippi, to make a bank deposit for her employer. Dr. Ackerman rear-ended Downs when she was stopped at a red light. An ambulance transported Downs to the emergency room at Keesler Medical Center, where she was examined and had x-rays and an MRI. Downs was released and, for the next ten months, she returned for periodic follow-up visits at Keesler's family-practice clinic for persistent neck pain. While Downs testified that, at these visits, she complained of headaches and balance problems, the Keesler records state that her balance was "normal" and her gait and stance were "normal." Downs completed three months of physical therapy. On July 1, 2008, a nurse practitioner at Keesler restricted Downs from working "until further evaluation from Dr. John McCloskey."

¶4. Downs's first visit with Dr. McCloskey, a neurosurgeon, occurred on June 23, 2008. Dr. McCloskey testified by video deposition that he diagnosed Downs with three problems:

2

posttraumatic neck and right shoulder pain,[1] visual problems, and bilateral carpal tunnel syndrome. He testified to a reasonable degree of medical certainty that these three conditions had been caused by the accident. Dr. McCloskey testified that a MRI showed a disc bulge at C5-C6, and wear-and-tear changes at C-4, 5, C-5, 6, and C-6, 7. He testified that the cervical spine is "frequently injured or ruptured with heavy lifting or rear-end auto accidents."

¶5. Dr. McCloskey referred Downs to a physical therapist for her neck and shoulder pain. He referred Downs for electrical studies for her hands, but the studies were negative for carpal tunnel syndrome. Nonetheless, Dr. McCloskey testified to a reasonable degree of medical probability that Downs suffered from carpal tunnel syndrome that had been caused by the accident. He testified that she should be limited to light work. Dr. McCloskey referred Downs to Dr. Terry Millette, a neurologist and neuroopthamologist, for assessment of her visual problems.

¶6. Dr. Millette testified by video deposition that, after performing neurological testing, he diagnosed Downs with central disequilibrium syndrome associated with a high neck injury. He testified that the syndrome is caused by an abnormal brain stem reflex, and causes a feeling of disequilibrium and an abnormal gait. Dr. Millette testified that Downs had the typical constellation of problems associated with the syndrome. He testified to a reasonable degree of medical probability that Downs's central disequilibrium syndrome was related to the accident. Dr. Millette treated Down's condition with clonazepam, which reduces the

---

[1] While Dr. McCloskey initially suspected a right-shoulder injury, an MRI revealed no problem with Downs's right shoulder.

feeling of disequilibrium, and he testified that she had improved on the medication. However, he testified that her condition is permanent, and that she will need to be under a doctor's continuing care for medication, physical therapy, and injections to diminish the symptoms.

¶7. On cross-examination, Dr. Millette was questioned about apparently contradictory statements he had made in a letter and documents he had filled out for GENEX, the company handling Downs's workers' compensation claim. In a October 8, 2008, letter, Dr. Millette stated that, from a neurologic standpoint, Downs could try to return to work. On October 20, 2008, he stated that it was within reasonable medical probability that Downs could perform the duties of a store manager. On June 3, 2009, he found that she had reached maximum medical improvement (MMI) on October 8, 2008. He stated that Downs needed no further diagnostic studies, must continue her present medication, and could perform her regular work full-time. He found no objective basis to give Downs an impairment rating. On September 3, 2009, he found she had reached MMI on August 18, 2009. He recommended no further treatment, and stated "I think that this nice lady should be allowed to return to work." Over Downs's objection, the trial court admitted these documents under Mississippi Rule of Evidence 803(6), finding that they were part of Dr. Millette's medical records.

¶8. Dr. Terry Smith, an neurosurgeon, testified by video deposition that he had evaluated Downs on December 21, 2008. He testified that all of her treatment had been reasonable and necessary. In Dr. Smith's opinion, Downs could return to work as a store manager.

¶9. Downs testified that, since the accident, she has experienced neck pain, headaches, pain in her hands, dizziness, balance problems, and vision problems. She testified that her hands have improved since she has been wearing splints at night, and that her disequilibrium

4

problems have improved with medication. But her testimony indicated that her injuries have prevented her from participating in life to the degree to which she was accustomed prior to the accident. Downs's husband, Robert Downs, testified that, since the accident, Downs had largely ceased socializing with her friends, and that he had to take care of their home and children because she could no longer do so.

¶10.    Downs testified that she had missed a week of work after the accident and then returned to work until she was restricted from working on July 1, 2008. Downs was out of work from July 1, 2008, until September 9, 2009, when she got a new job at Target. She testified that she had attempted to return to work in fall 2008, but her employer had refused to allow her to return because she was taking clonazepam. She testified that she was, in fact, unable to perform the duties of a store manager at the clothing store, because that job required duties in addition to those listed on the job descriptions given to her physicians. She testified that these additional duties had required her to lift boxes of inventory that weighed up to 100 pounds. Downs also testified that, prior to the accident, she routinely had lifted boxes that weighed up to 100 pounds. Downs testified that her injuries have prevented her from being a hard worker and a good mother, friend, and wife. Downs testified that, due to her injuries, her "life is ruined."

¶11.    Downs sought to recover her past and future medical expenses, past and future lost wages, pain and suffering, and mental and emotional distress. She presented medical bills totaling $20,800.30 and claimed approximately $10,500 in past lost wages. The trial court entered an agreed order allowing Downs's workers' compensation insurance carrier, Sentry Insurance Company, to intervene in the action to protect its subrogation claim, which at the

time of the motion to intervene totaled $30,608. Robert Downs asserted a loss-of-consortium claim.[2] In closing arguments, Downs's counsel argued that a fair verdict for Downs would be $251,000.

¶12.    During deliberations, the jury sent out three questions to the court, asking "(1) Did Dr. Ackerman have insurance?;" (2) "How much did insurance pay toward medical bills?;" and (3) "Of amount of medical bills not covered by car ins. what was out of pocket expenses?" With the parties' agreement, the trial court instructed the jury that "You are not to concern yourself with these issues. You are to concentrate on the evidence and testimony presented at trial. Continue to deliberate." The jury returned a verdict for Downs in the amount of $20,000 and awarded nothing to Robert Downs. The trial court denied Downs's post-trial motion for an additur or a new trial.

¶13.    Downs appealed, arguing that the trial court should have granted her motion for an additur or a new trial on damages. This Court assigned the case to the Court of Appeals, which reversed and remanded for an additur, or if the additur was not accepted, a new trial on damages. Noting that Dr. Ackerman had offered no witnesses and merely had cross-examined Downs's witnesses, the Court of Appeals found that Dr. Ackerman had failed to offer contradictory evidence rebutting Downs's evidence that her injuries had been caused by the accident. The Court of Appeals concluded that, based on the record evidence, the verdict of $20,000 was against the overwhelming weight of the credible evidence and constituted inadequate compensation for Downs's claimed damages. The Court of Appeals contrasted the amount of Downs's medical bills of $20,800.30 with the  verdict of $20,000

---

[2] Robert Downs's claim is not a subject of this appeal.

and inferred evidence of bias, prejudice, or passion. Also, the Court of Appeals found that the jury's questions about insurance, along with the admission of the GENEX documents that referred to Downs as a "claimant," indicated jury confusion.

¶14. We granted Dr. Ackerman's petition for certiorari and now reverse the Court of Appeals and reinstate and affirm the trial-court judgment.

## ANALYSIS

¶15. Mississippi Code Section 11-1-55, which provides for an additur or remittitur, states:

> The supreme court or any other court of record in a case in which money damages were awarded may overrule a motion for new trial or affirm on direct or cross appeal, upon condition of an additur or remittitur, if the court finds that the damages are excessive or inadequate for the reason that the jury or trier of the facts was influenced by bias, prejudice, or passion, or that the damages awarded were contrary to the overwhelming weight of credible evidence. If such additur or remittitur be not accepted then the court may direct a new trial on damages only. If the additur or remittitur is accepted and the other party perfects a direct appeal, then the party accepting the additur or remittitur shall have the right to cross appeal for the purpose of reversing the action of the court in regard to the additur or remittitur.

Miss. Code Ann. § 11-1-55 (Rev. 2002).

¶16. We review the trial court's decision to deny an additur for abuse of discretion. *Thompson v. Nguyen*, 86 So. 3d 232, 237 (2012). The party claiming an additur has the burden of proving his injuries and damages. *Maddox v. Muirhead*, 738 So. 2d 742, 743 (Miss. 1999). "We view the evidence in the light most favorable to the defendant, giving him all favorable inferences that may be reasonably drawn therefrom." *Id.* (citing *Rodgers v. Pascagoula Pub. Sch. Dist.*, 611 So. 2d 942, 945 (Miss. 1992)). The amount of damages is a question for the jury. *Maddox*, 738 So. 2d at 743. Because a jury award is not merely advisory, it generally will not be "set aside unless so unreasonable as to strike mankind at

7

first blush as being beyond all measure, unreasonable in amount and outrageous." *Id.* (quoting *Rodgers*, 611 So. 2d at 945). "Additurs represent a judicial incursion into the traditional habitat of the jury, and therefore should never be employed without great caution." *Maddox*, 738 So. 2d at 743 (quoting *Gibbs v. Banks*, 527 So. 2d 658, 659 (Miss. 1988)).

¶17.     The Court of Appeals found that Dr. Ackerman had failed to offer sufficient evidence to rebut Downs's claim that her medical expenses were necessary and reasonable. This Court has held that "[w]hen a party takes the witness stand and exhibits bills for examination by the court and testifies that said bills were incurred as a result of the injuries complained of, they become prima facie evidence that the bills so paid or incurred were necessary and reasonable." *Estate of Bolden v. Williams*, 17 So. 3d 1069, 1071-72 (Miss. 2009) (quoting *Jackson v. Brumfield*, 458 So. 2d 736, 737 (Miss. 1984)); *see* Miss. Code Ann. § 41-9-119 (Rev. 2009). "The opposing party may then 'rebut the necessity and reasonableness of the bills by proper evidence,'" and "[i]f the opposing party rebuts the medical bills by proper evidence, the question is ultimately one for the jury." *Estate of Bolden*, 17 So. 3d at 1072 (quoting *Jackson*, 458 So. 2d at 737). Relying on these principles, the Court of Appeals held that Downs's presentation of her medical bills, along with medical testimony that the bills were incurred due to the accident, constituted prima facie evidence that the bills were necessary and reasonable. The Court of Appeals held that Dr. Ackerman's cross-examination of Downs's experts was insufficient to rebut the presumption that her bills were necessary and reasonable.

¶18.    Even if medical bills are necessarily and reasonably incurred for a particular condition, that fact does not "mandate a finding that those medical bills were incurred as a result of the accident in question." *Herring v. Poirrier*, 797 So. 2d 797, 809 (Miss. 2000). Therefore, while Downs's medical bills established a presumption that those bills were reasonable and necessary for the treatment of her injuries, her medical bills were not prima facie evidence that the accident was the proximate cause of Downs's injuries. Downs had the burden to prove by a preponderance of the evidence that the accident proximately caused her neck injury, carpal tunnel syndrome, and central disequilibrium syndrome. Downs attempted to meet this burden with the testimony of Dr. McCloskey and Dr. Millette, who testified to a reasonable degree of medical probability that these conditions had been caused by the accident. Dr. Ackerman attempted to cast doubt on this causation testimony through cross-examination. Regarding proof of proximate cause of injuries incurred in a rear-end collision, we have stated that

> A plaintiff has the burden of proof, and must offer evidence that persuades the jury. The jury is not required to believe or trust the evidence submitted by the plaintiff, and is free to accept all, part, or none of the plaintiff's evidence. A defendant is not required to prove or rebut anything.
> . . .
>
> [Expert opinions are] not obligatory or binding on triers of fact but [are] advisory in nature. The jury may credit them or not as they appear entitled, weighing and judging the expert's opinion in the context of all of the evidence in the case and the jury's own general knowledge of affairs.

*Thompson v. Nguyen*, 86 So. 3d 232, 236-37 (Miss. 2012) (citation omitted).

¶19.    Through cross-examination, Dr. Ackerman sought to show that Downs's injuries had not been caused by the accident. Dr. Ackerman cross-examined Downs's physicians about

the fact that her complaints had become dramatically worse ten months after the accident, when she saw Dr. McCloskey and was referred to Dr. Millette. Dr. Ackerman attacked Dr. Millette's opinion that the accident had caused Downs's central disequilibrium syndrome by pointing to the records of Downs's numerous visits to Keesler, which indicated that her gait and balance had been "normal" for ten months post-accident. While Dr. McCloskey opined to a reasonable degree of medical probability that Downs had carpal tunnel syndrome, testing did not confirm that diagnosis, casting doubt on his conclusion that Downs had suffered carpal tunnel syndrome as a result of the accident. In closing arguments, Dr. Ackerman relied on the opinion of Dr. McCloskey to argue that Downs's heavy lifting at work could have aggravated her neck to the degree that it caused her to develop carpal tunnel syndrome and central disequilibrium syndrome. Our standard of review demands that we view the evidence in the light most favorable to Dr. Ackerman and give Dr. Ackerman the benefit of all favorable inferences. So considered, we cannot say that the verdict was "so unreasonable as to strike mankind at first blush as being beyond all measure, unreasonable in amount and outrageous." *Maddox*, 738 So. 2d at 743. The trial court was within its discretion in finding that the verdict was not against the overwhelming weight of the evidence.

¶20.    Nor did the trial court abuse its discretion by finding that the verdict was not the product of bias, prejudice, or passion as a result of the GENEX letters. The Court of Appeals found that the jury's questions, along with the admission of the GENEX letters, indicated that the jury was confused and that the verdict was the product of bias, prejudice, or passion. The jury's questions were "(1) "Did Dr. Ackerman have insurance?;" (2) "How much did insurance pay toward medical bills?;" and (3) "Of amount of medical bills not covered by car

ins. what was out of pocket expenses?" In denying the motion for an additur, the trial court stated that, when the jurors were departing the courtroom to begin deliberations, one juror had asked the court whether the jury could ask some questions. The trial court noted that, at that time, the jury did not have the GENEX letters. The trial court found that the jury's questions did not relate to the content of the GENEX letters, but instead referred to medical or automobile insurance, matters of common knowledge. Therefore, the trial court found that the admission of the GENEX letters had not biased or prejudiced the jury. Indeed, the jury's questions do not refer to workers' compensation insurance or the GENEX letters, and as found by the trial court, refer to liability insurance. The trial court instructed the jury not to concern itself with these questions, but to continue to deliberate. We find no abuse of discretion in the trial court's finding that the verdict was not the product of bias, prejudice, or passion. The trial court's denial of Downs's motion for an additur or a new trial on damages was not an abuse of discretion.

## CONCLUSION

¶21.    Because the trial court's denial of Downs's motion for an additur or a new trial on damages was not an abuse of discretion, we reverse the judgment of the Court of Appeals and reinstate and affirm the judgment of the Jackson County Circuit Court.

¶22.    **THE JUDGMENT OF THE COURT OF APPEALS IS REVERSED. THE JUDGMENT OF THE JACKSON COUNTY CIRCUIT COURT IS REINSTATED AND AFFIRMED.**

   **WALLER, C.J., DICKINSON AND RANDOLPH, P.JJ., LAMAR, KITCHENS, PIERCE, KING AND COLEMAN, JJ., CONCUR.**

11