# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2022-CA-01228-COA

**NATHANIEL YOUNGER AND JACKSON PUBLIC SCHOOL DISTRICT**                    APPELLANTS

**v.**

**WILLIE B. SOUTHERN, JR.**                    APPELLEE

DATE OF JUDGMENT:                    11/08/2022
TRIAL JUDGE:                    HON. TOMIE T. GREEN
COURT FROM WHICH APPEALED:    HINDS COUNTY CIRCUIT COURT,
                                                   FIRST JUDICIAL DISTRICT
ATTORNEYS FOR APPELLANTS:    STEVEN LLOYD LACEY
                                                   BRETT RAY KOEHN
ATTORNEYS FOR APPELLEE:    JOHN S. GRANT IV
                                                   BROOKE T. GRANT
NATURE OF THE CASE:    CIVIL - PERSONAL INJURY
DISPOSITION:    AFFIRMED IN PART; REVERSED AND
                                                   RENDERED IN PART - 04/22/2025
MOTION FOR REHEARING FILED:

**EN BANC.**

**EMFINGER, J., FOR THE COURT:**

¶1.    An empty school bus driven by Jackson Public School District (JPS) employee Nathanial Younger collided with another vehicle driven by Willie B. Southern Jr., who later brought the lawsuit that is the subject of this appeal.[1]  In his complaint, Southern sought damages for personal injuries and damages for the loss of his vehicle. After a bench trial, the Hinds County Circuit Court found JPS was liable for the accident and ordered it to pay

---

[1] We refer to Younger and JPS together at times as "JPS," noting Younger was dismissed from liability in his individual capacity. *See infra* note 4.

Southern $5,000 for the loss of his truck, $21,120 in compensatory damages for his medical expenses,[2] and $90,000 for past and future pain and suffering. JPS appealed, and Southern cross-appealed.[3] Upon review, we affirm in part and reverse and render in part.

**FACTS AND PROCEDURAL HISTORY**

¶2.    Southern filed his complaint on November 27, 2017, naming JPS and Younger as defendants.[4] Southern was the only witness called to testify in support of his negligence claim. He testified that on November 28, 2016, a little after 2 p.m., he was driving "south on Highland Drive in front of Kirksey School, and basically I was just driving south, and the school bus come off the parking lot and just ran into the side of my truck." Southern said that his truck was struck on the passenger side, and following impact, his truck came to rest in the yard across from the school. When asked what happened to his body on impact, Southern testified that he was not wearing a seatbelt and that he was thrown about inside the truck.[5] He also said he hit his head on the top of the truck. Southern stated that the bus

---

[2] During opening statements, Southern's attorney asked for $11,430.50 in medical expenses.

[3] Although Southern filed a notice of cross-appeal, in his appellee's brief, he expressly abandons the cross-appeal, which we deem dismissed, and only responds to the JPS raises.

[4] Younger was later dismissed, individually, as a defendant after the trial court found that he was, at all relevant times, acting within the course and scope of his employment with JPS, and not in his individual capacity. The trial court ruled that any negligence of Younger would be imputed to JPS.

[5] Southern testified at trial that he was not wearing a seatbelt at the time of the accident because he was repairing his truck, and there was no seatbelt in the truck. However, hospital records show that Southern reported he "was restrained by a shoulder strap and a lap belt."

"bulldozed" his truck across the north two lanes of travel. According to Southern, when he got out of the truck, he walked around a little bit, dazed, and then walked across the street to the school and called his wife. He testified that he was not feeling like his normal self.

¶3. Southern testified that his wife took pictures of the school bus, his truck, and the location where the accident happened. Because of the damage to the truck, Southern was not able to drive it from the scene of the accident. He waited for a wrecker to come pick up his truck before he left with his wife.

¶4. Southern testified that the responding officers asked if he wanted an ambulance, but he declined. Instead, Southern's wife drove him from the accident scene to the emergency room (ER) at the University of Mississippi Medical Center (UMMC). The UMMC records show that Southern arrived at the ER at 5:25 p.m., about three hours after the accident.[6]

¶5. Southern testified that he went to the ER because he felt a tingling in his neck, and his head had started to hurt after the accident. While UMMC records show that Southern reported a headache, they do not show that he reported a "tingling in his neck" or that he reported a back injury. In fact, the records stated in part: "Neurological: Negative for tingling, loss of consciousness and numbness." When asked what injuries the physicians at UMMC diagnosed him with at that visit, Southern could not recall any diagnosis, but he admitted that he refused a CT scan because "I am a cautious person. I don't like dealing with medication and radiation." The UMMC records show that the "Final Diagnosis" was

_____

[6] The "History" portion of these records show that Southern said the accident occurred six to twelve hours before he arrived at the ER. The records further show that Southern first went home before going to the ER. Southern testified that these statements in the UMMC records were incorrect.

"Headache."

¶6.     Southern testified that he went to Action Chiropractic Inc. "for my back injury and for my neck." He was treated at Action Chiropractic from December 1, 2016, to March 1, 2017. According to Southern, he went to the chiropractic clinic "trying to get my back injury resolved." The Action Chiropractic records show that during his initial visit, Southern complained of low back pain, neck pain, and a headache. He testified that he was having pain in his lower back going down into his hip area when he walked too long. When questioned by JPS about tests performed by Action Chiropractor, Southern could not remember them performing an MRI or an X-ray. When Southern was shown bills for an X-ray, he testified that he could not recall whether he had an X-ray. Records show that an X-ray revealed "loss of lordosis." Southern testified that he was not sure what lordosis was and that there was no medical testimony to explain the condition or give a medical opinion as to the cause of the condition.  In any event, at the end of treatment administered by Action Chiropractic, Southern testified that "we thought that the injury that I have probably I could grow out of it, but it didn't improve."

¶7.     Almost two years after the accident, on October 26, 2018, Southern went to see Dr. Anderson with MEA Medical Clinic, a service of St. Dominic Hospital (MEA).[7] The records

_____

[7] In the MEA records admitted at trial, there was a record of Southern's earlier visit to MEA on November 16, 2017, when he saw Dr. McAllister, which was about a year after the accident and a year before he returned to see Dr. Anderson and complained of back pain. That 2017 visit was for an infected area on a finger and nose bleeds. The record notes, however, that Southern denied muscle aches or pain. Further, in the "Review of Systems" section of the record concerning his neurologic system, Southern denied tingling or numbness and denied impairment. He made no report of back pain at that time.

4

show that Southern complained of back and neck pain and a concern about his blood pressure and weight gain. Dr. Anderson referred him to Genesis Physical Therapy (Genesis) in Madison for physical therapy.

¶8.     On October 30, 2018, Southern visited Genesis. The records from Genesis indicated that as a result of that visit, he was scheduled for therapy three times a week for the next four weeks. Southern returned to Genesis for eight more therapy sessions between November 1 and November 16, 2018. The daily therapy notes show that beginning on November 5, Southern was complaining of more soreness, and the note states that "[h]e does lots of bending and lifting at work." The next session note from November 7 records the same note. The next session note from November 9 states: "Patient reports that he went to MEA yesterday for a follow-up and they did some blood work and he will hear back today regarding the results." The next therapy session note from November 12 states: "Patient reports he received the results from his blood work. He is dehydrated and was told to increase his water intake and also reports he has some inflammation in his body. He will return for a follow-up visit on Wednesday." The therapy note from his next session on November 14, 2018, states that "Patient reports he will go back to MEA today for follow-up with blood work. Patient reports continued tightness and soreness/stiffness in low back." The final therapy session note from November 16 states that Southern had blood drawn on Wednesday but has not received the results yet. The note also states: "While performing exercises in gym, patient takes a phone call from MEA. He reports they have instructed him to stop therapy for a week and to 'rest and relax' due to 'elevated blood work.' He does not finish the

ex/modalities today. He is instructed to call Genesis in one week after returning to the doctor to let us know further instruction." The last note from Genesis was on December 3, 2018, and states that Southern was being discharged because he reported that he is being referred to a specialist due to lab-work results.[8] According to Southern's testimony, he could not complete the therapy because he was in so much pain.

¶9. The records from MEA during the above period of therapy at Genesis show that on November 8, 2018, he was seen by Dr. Anderson concerning back soreness and pain radiating into his right leg. The doctor ordered an "MRI Lumbar Spine" and "LAB: Creatine Kinase (CK) (CPK)." The records show that blood was drawn during that visit. Southern went back to MEA on November 14, and more blood was drawn. On November 23, Southern went to MEA to see Dr. Anderson. Southern made this appointment because, according to the records, he had questions about his "ck levels" and his "kidney/liver functioning." Apparently, more blood was drawn during this visit. Southern called MEA on November 26 requesting the lab results and wanting to speak with a nurse regarding approval for an MRI. Apparently, MEA was having difficulty getting an MRI approved by his insurance. On December 19, 2018, Southern called again concerning MRI scheduling. On February 8, 2019, there is a record that Southern called MEA again and advised that he had new insurance. The record notes that Southern wanted to return for an evaluation and "hopefully get an MRI." Southern saw Dr. Anderson on February 13, 2019, and he reported that he was still having back pain with radiation into his right leg. He reported that he had to stop physical therapy.

---

[8] There is no testimony or evidence in the medical records to explain the nature of the problem with Southern's blood work or to connect any such problem to the accident.

The record indicates that Dr. Anderson ordered an MRI of the lumbar spine.

¶10. According to records produced by St. Dominic Health Services, the MRI Dr. Anderson ordered was performed on February 20, 2019. The findings contained in the report on the MRI show as follows:

> L5-S1 correlates with the disc space seen on axial image 7 and demonstrates severe degenerative disc disease, moderate generalized disc bulging and facet DJD causing moderate bilateral foraminal stenosis and mild right lateral recess narrowing. Mild indentation of the ventral thecal sac without significant canal stenosis.

> L4-5 demonstrates moderate degenerative disc disease, minimal posterior annular fissuring, mild to moderate joint disc bulging, and moderate facet DJD causing mild bilateral foraminal stenosis.

> L3-4 demonstrates mild bilateral facet DJD and mild bilateral foraminal narrowing with normal disc margin and unremarkable appearing disc.

> There is minor bilateral foraminal narrowing at L2-3 with minimal facet arthrosis but otherwise normal appearance.

> Slightly short pedicles contribute to the above described foraminal narrowing.

¶11. After the MRI, Dr. Anderson's records show that she referred Southern to St. Dominic's Neurosurgery Associates and Dr. Gaspard, a neurologist, on February 21, 2019. Dr. Gaspard saw Southern on March 5, 2019, and reviewed the MRI results. Dr. Gaspard assessed Southern's "primary" condition to be sacroiliitis. When asked at trial if he knew of that condition, Southern testified that "they have discussed it with me but I'm kind of vague on it." The neurologist's records also show "some indication of some hip pain caused from inflammation" caused by "prolonged standing." Southern agreed that was an issue, but testified that he did not have that pain before the accident. Dr. Gaspard's records show that

7

he treated Southern for sacroiliitis and referred Southern to Dr. Lyons and Dr. Nutt for "physical therapy and pain management injections."

¶12.    On April 2, 2019, Southern went back to Dr. Anderson and told her that Dr. Gaspard had recommended injections that he did not want to do. Further, he advised Dr. Anderson that he had been sent back to physical therapy and that he was having difficulty doing it. Dr. Anderson sent Southern back to Dr. Lyons for pain medicine for his chronic low back pain.

¶13.    Southern returned to see Dr. Anderson on April 30, 2019, because of pain in his right knee. He advised Dr. Anderson that he did not know how it was injured. He said that he bends down at work a lot and cannot use his right leg to push back up. She ordered an X-ray of his right knee, gave him a knee brace and told him to do no heavy lifting for five days. The radiology report showed mild degenerative joint disease in his right knee.[9]

¶14.    On February 5, 2020, Southern returned to see Dr. Anderson. At that visit he complained of hot flashes, chronic back pain, diarrhea, and dyspepsia. He again told Dr. Anderson that Dr. Gaspard had recommended a procedure he did not want to have and that pain management had offered injections, and he did not want to have those either. Southern testified that he is "not a medicine person. I like natural healing, and I didn't want to take those shots because I would prefer to be natural." He told Dr. Anderson that the "pain doctor" had told him that his back pain could be causing his diarrhea. As a result of this visit, Dr. Anderson referred him to the gastroenterology department.

¶15.    At trial, Southern testified that his problems with his neck and back were continuing.

---

[9] No testimony or record evidence connects this knee injury to the auto accident that occurred over two years earlier.

8

Before the accident, Southern stated that he played basketball, baseball, and a little golf. But he could no longer do those things because of the pain he felt after exercising. He asked the court to order that he be reimbursed for his medical bills,[10] the total loss of his truck, and past and future pain and suffering. According to Southern, his truck was an antique 1977 Ford F150, and he had installed a $3,000 motor. Southern claimed he would have asked at least $5,000 for the antique truck. He also asked for pain and suffering in the amount of $500,000.

¶16.    Once Southern rested his case-in-chief, JPS moved for a dismissal pursuant to Mississippi Rule of Civil Procedure 41(b). JPS argued that Southern had failed to meet his burden of proof that any injury for which Southern was treated was proximately caused by the accident. JPS argued that medical expert testimony was required to meet the burden of proof in this case. Southern responded that Southern's testimony was sufficient because he testified that he had not experienced any pain prior to the accident. Southern had testified that all the medical bills he presented were incurred as a result of the accident. The trial court denied JPS's motion. JPS then called the officer who responded to the accident, Officer Cazinova Reed, as its only witness. After Officer Reed finished testifying, both sides rested. The court asked that both parties submit any additional authorities they wished the court to consider. The court issued its "Memorandum Opinion" on November 8, 2022, finding in favor of Southern and awarding the damages as noted above. No post-trial motions were filed, and JPS filed this appeal.

**STANDARD OF REVIEW**

---

[10] Southern testified he owed UMMC $399, Action Chiropractic $4,506, MEA $1,686, St. Dominic $3,243.50 for an MRI, Dr. Gaspard $220, and Genesis $1,258.33.

¶17.    In *Crawford ex rel. Hodge v. East Mississippi State Hospital Inc.*, 397 So. 3d 871, 877 (¶¶20-21) (Miss. Ct. App. 2024), this Court stated:

> We first address the issue of proximate cause, beginning with our standard of review. "A circuit court judge sitting as the trier of fact is given the same deference with regard to his fact finding as a chancellor, and his findings are safe on appeal when they are supported by substantial, credible, and reliable evidence." *Maxwell* [*v. Panola County*, No. 2021-CA-01001-COA;], 2023 WL 2132171, at *3 (¶30) [(Miss. Ct. App. Feb. 21, 2023)] (quoting [*Miss. Dept. Pub. Safety* v.] *Durn*, 861 So. 2d [990, 994 (¶7)(Miss. 2003)), *cert. denied* (Miss. Sept. 8, 2023)]. "Findings of fact by a trial judge after a bench trial are subject only to a limited scope of review if the trial judge applied the appropriate legal standard." *Univ. Med. Ctr. v. Martin*, 994 So. 2d 740, 746 (¶24) (Miss. 2008) (citing *Meeks v. State*, 781 So. 2d 109, 113 (¶9) (Miss. 2001)). Consequently, a trial court's findings must be "afforded deferential treatment." *Id*. at (¶24) (quoting *Univ. of Miss. Med. Ctr. v. Pounders*, 970 So. 2d 141, 147 (¶23) (Miss. 2007)).
>
> Causation, as an element of a wrongful death claim, is an essential finding for Crawford to recover. "It is essential . . . that the negligence complained of shall be the proximate cause, or at least a directly contributing cause, of the death which is the subject of the suit." *Berryhill v. Nichols*, 171 Miss. 769, 158 So. 470, 471 (1935). "The negligence, and not something else, must have been the cause which produced or directly contributed to the death." *Id*. (citing *Hamel v. So. Ry. Co.*, 113 Miss. 344, 358, 74 So. 276 (1917)). Proximate cause must be proved "as a reasonable probability. To prove no more than that it was a possibility is not a sufficient foundation for the support of a verdict or judgment." *Id*.

### ANALYSIS

¶18.    On appeal, JPS has not contested the trial court's finding that the negligence of Younger was the sole proximate cause of the accident. The issues for appellate review JPS raises can be combined into two basic issues, which will be addressed separately below.

> **I.      Did the trial court err by finding that the negligence of JPS was the proximate cause of all the medical bills Southern incurred after the accident?**

¶19. Southern's complaint charged that JPS's negligence caused the accident. As noted above, the trial court found that JPS's negligence *did* cause the accident, and that finding is not challenged on appeal. However, that finding is not enough for Southern to recover damages. In *Knox v. Mahalitc*, 105 So. 3d 327, 329 (¶7) (Miss. Ct. App. 2011), this Court stated:

> In order to prove negligence, a plaintiff must show "duty, breach, causation, and damages." *Duckworth v. Warren*, 10 So. 3d 433, 440 (¶23) (Miss. 2009) (quoting *Todd v. First Baptist Church of West Point*, 993 So. 2d 827, 829 (¶10) (Miss. 2008)). **However, even if a party is negligent, he is not liable to the plaintiff unless the negligence is "the proximate cause of the injury."** *Utz v. Running & Rolling Trucking, Inc.*, 32 So. 3d 450, 466 (¶41) (Miss. 2010) (citing *Jones v. U.S. Fid. & Guar. Co.*, 822 So. 2d 946, 948 (¶7) (Miss. 2002)). **"Proximate cause requires the fact finder to find that the negligence was both the cause in fact and the legal cause of the damage."** *City of Jackson v. Spann*, 4 So. 3d 1029, 1033 (¶11) (Miss. 2009) (citing *Glover v. Jackson State Univ.*, 968 So. 2d 1267, 1277 (¶31) (Miss. 2007)).

(Emphasis added).

¶20. JPS argues that Southern could not meet this burden by relying solely on his own testimony because the causal connection is not clear, as in cases with a broken bone. In support of its argument JPS cites *Rankin v. Averitt Express Inc*., 115 So. 3d 874, 879 (¶17) (Miss. Ct. App. 2013), where this Court explained:

> Unless the case is simple and routine, medical causation must prove the disability and the causal connection to employment by use of expert testimony. *Shipp v. Thomas & Betts*, 13 So. 3d 332, 337 (¶21) (Miss. Ct. App. 2009). "The causal connection between the claimant's injury and disability must be proven with competent medical proof and based upon a reasonable degree of medical probability." *Anthony v. Town of Marion*, 90 So. 3d 682, 690 (¶28) (Miss. Ct. App. 2012) (quoting *Airtran v. Byrd*, 953 So. 2d 296, 299 (¶3) (Miss. Ct. App. 2007)).

In response, Southern relies upon his medical records and his own testimony to establish that

11

the accident was the proximate cause of his need for the medical treatments reflected by the medical bills that were admitted into evidence. On appeal, Southern points to *City of Jackson v. Graham*, 226 So. 3d 608 (Miss. 2017), for the proposition that the plaintiff's own testimony is sufficient and to argue that there was no need to produce a medical expert to establish causation. However, in *Graham*, the trial court

> determined that it could not be seriously contended by the City that Graham went to the various doctors for anything other than the accident. Accordingly, the trial court found that the City did not rebut any testimony proving that Graham's treatment was a result of the crash. We agree.

*Id*. at 613 (¶20). The opinion in *Graham* does not identify the nature or extent of Graham's injuries and does not give any details of the medical treatment she received. The appellate record in *Graham* reveals that Graham was transported, while unconscious, by ambulance to UMMC, where she remained hospitalized for three days. She suffered lacerations that required stitches and was found to have a fractured spine and later required shoulder surgery.

¶21.    In the present case, according to the testimony and medical records, Southern suffered no obvious injuries. While Southern certainly would be entitled to payment for his ER visit to UMMC several hours after the accident, the causal connection for all subsequent medical treatments is not so clear. To simply produce medical records and invoices to show proximate cause is insufficient, especially where there are no obvious injuries. In *Downs v. Ackerman*, 115 So. 3d 785, 790-91 (¶18) (Miss. 2013), the supreme court stated:

> Even if medical bills are necessarily and reasonably incurred for a particular condition, that fact **does not "mandate a finding that those medical bills were incurred as a result of the accident in question**." *Herring v. Poirrier*, 797 So. 2d 797, 809 (Miss. 2000). Therefore, while Downs's medical bills established a presumption that those bills were reasonable and necessary for

12

the treatment of her injuries, **her medical bills were not prima facie evidence that the accident was the proximate cause of Downs's injuries**.

(Emphasis added). Judge McDonald's separate opinion cites the latter portion of this paragraph in *Downs* that confirms the "plaintiff has the burden of proof" to establish proximate cause, and a "defendant is not required to prove or rebut anything." *Id*. at 791 (¶18). However, her separate opinion then argues, concerning proximate cause, that "JPS and Younger had the opportunity to rebut this presumption with proper evidence." Both separate opinions miss this point. The presumption provided by Mississippi Code Annotated section 41-9-119 (Rev. 2023) only relates to the fact that the medical bills are "reasonable and necessary" and, as established by *Downs*, are not "prima facie evidence" of proximate cause. There is no presumption relative to proximate cause, and the burden of proof never shifts to a defendant.[11]

¶22. Further, in *Childers v. Illinois Central Railroad Co.*, 281 So. 3d 1175, 1180 (¶7) (Miss. Ct. App. 2019), this Court explained:

> For example, where an injury is fairly self-evident, such as a car accident resulting in a broken limb, the average layman could deduce the resulting injury and its cause. *Id*. (citing *Moody v. Maine Cent. R.R. Co.*, 823 F.2d 693, 695-96 (1st Cir. 1987)). The causal link between a cancer diagnosis and exposure to harmful toxins, however, often requires the expertise and knowledge of a medical expert.

---

[11] *See Britt v. All American Assur. Co. of La.*, 333 So. 2d 629, 631-32 (Miss. 1976):

> Although it is sometimes said that the burden of proof shifts to the defendant, strictly speaking, the burden of proof never shifts to the defendant. Where a plaintiff has made out a prima facie case of 'accidental death' the defendant is then required to go forward with the proof to show that the prima facie testimony of an accident is not the true facts. [*Taylor v. Insurance Company of North America*], 263 So. 2d [749,] 751 [(Miss. 1972)].

While a plaintiff may describe his injuries, there are limitations. In *Graves v. Graves*, 531 So. 2d 817, 822 (Miss. 1988), the supreme court ruled:

> Although Johnny was competent to testify as to his own pain and suffering and to describe his physical injuries, *Dennis v. Prisock*, 221 So. 2d 706 (Miss.1969), he was **clearly incompetent to testify regarding his own medical prognosis and treatment.** *Temple Construction Co. v. Haylor*, 351 So. 2d 1350, 1352 (Miss. 1977); *F.W. Woolworth Co., Inc. v. Volking*, 135 Miss. 410, 419, 100 So. 3, 4 (1924).

(Emphasis added); *see also Estate of Miles v. Burcham*, 127 So. 3d 213, 219 (¶13) (Miss. 2013) ("The need for diagnostic examinations, of course, must be supported by the testimony of competent medical experts.").

¶23.    Southern's testimony clearly shows why testimony from his treating physicians was needed. Southern could not explain the meaning of certain conditions that were identified in his medical records, such as loss of lordosis, degenerative disc disease, spondylosis, and sacroiliitis. He *could have been* born with some of these conditions, others *may* be a natural result of the aging process, and some *may* be a result of trauma. There is no statement in the records by a treating professional where the person gives an opinion that these conditions were caused by the accident. As a result, without testimony from a medical expert or treating physician, we may only speculate as to the proximate cause of Southern's conditions. The records also reflect that he was treated for hip pain that resulted from prolonged standing. Southern disagreed with certain findings contained in the records and could not explain what certain test results meant. The records noted that he did a lot of lifting at work, but Southern denied that contention. At one point in his testimony, he stated, "I'm wondering myself what's going on here."

14

¶24. Under the facts of this case, we find that Southern's testimony alone was not sufficient to support the trial court's finding that his conditions were proximately caused by the accident. In the absence of obvious injuries on the day of the accident, we find that Southern needed expert medical testimony, or at least the testimony of the treating physicians, to explain the medical records, and to establish that the accident was a proximate cause of his need for specific medical treatments (after the day of the accident) and his pain, suffering, and mental anguish after that the accident. We therefore reverse and render the trial court's finding that Southern was entitled to an award of damages for past, present, and future pain, suffering, and mental anguish. We also reverse and render an award of $399 in compensatory medical damages.

**II.    Did the trial court err by awarding Southern $5,000 for the total loss of his truck?**

¶25. JPS contends that the trial court's award of $5,000 for the loss of his truck was based upon pure speculation. JPS argues that there was no support for Southern's valuation of his truck. JPS points out that "He offered no estimates, bills of repair, insurance adjuster's report or any other evidence showing the vehicle's value." To prove a total loss, Southern was required to prove the value of the truck before the accident, the cost to repair the truck after the accident, and the salvage value if it were not repaired. JPS contends Southern's conclusion that his truck was "totaled" is not supported by the evidence.

¶26. Southern testified that his truck was hit from the side, and the main frame of the body was bent. He further told the court that it could not be straightened. Concerning the value of the truck, Southern stated:

15

Now it's an antique truck and it holds a lot of sentimental value for being an antique, and I had just re-put that truck together as an antique truck, and if I were to sell it, I would have asked for a little bit more because the motor in the truck itself was three. I would have asked for at least $5,000.00 for the truck because it was [an] antique.

Concerning an owner's valuation of his property, the supreme court stated in *Moore v. State*, 187 So. 3d 109, 115 (¶18) (Miss. 2016):

> This Court has held that "individuals may testify as to the value of their own property." *Cmty. Bank, Ellisville, Miss. v. Courtney*, 884 So. 2d 767, 774-75 (Miss. 2004) (quoting *Regency Nissan, Inc. v. Jenkins*, 678 So. 2d 95, 101 (Miss.1995)). *See also Robichaux v. Nationwide Mut. Fire Ins. Co.*, 81 So. 3d 1030, 1038 (Miss. 2011). The owner's estimate does not have to "be rationally based," and no predicate is required other than ownership. *Courtney*, 884 So. 2d at 774-75 (quoting *Regency Nissan*, 678 So. 2d at 101).

¶27. The trial court obviously accepted Southern's valuation of the truck. We review only for clear error, and given that standard of review, we cannot say that the trial court's award of $5,000 for the total loss of the truck was clearly erroneous.

## CONCLUSION

¶28. Upon review, we affirm the trial court's award of $5,000 for the total loss of Southern's truck. We reverse the award of damages for past, present, and future pain, suffering, and mental anguish. We reverse the award of past, present, and future compensatory medical damages in the amount of $21,120 and render an award of compensatory damages for past medical expenses in the amount of $399.

¶29. **AFFIRMED IN PART; REVERSED AND RENDERED IN PART.**

**BARNES, C.J., CARLTON AND WILSON, P.JJ., LAWRENCE, WEDDLE AND ST. PÉ, JJ., CONCUR. WESTBROOKS, J., CONCURS IN PART AND DISSENTS IN PART WITH SEPARATE WRITTEN OPINION, JOINED BY McDONALD AND McCARTY, JJ. McDONALD, J., CONCURS IN PART AND**

**DISSENTS IN PART WITH SEPARATE WRITTEN OPINION, JOINED BY WESTBROOKS AND McCARTY, JJ.**

**WESTBROOKS, J., CONCURRING IN PART AND DISSENTING IN PART:**

¶30.   I agree with the conclusion and rationale of Judge McDonald's separate opinion concurring in part and dissenting in part.  I write separately to emphasize this Court's holding in *City of Jackson v. Graham*, 226 So. 3d 608 (Miss. Ct. App. 2017): a plaintiff in a simple negligence action is not required to present medical expert testimony to establish causation. *Graham* and its progeny are still good law.

¶31.   "Proof that medical, hospital, and doctor bills were paid or incurred because of any illness, disease, or injury shall be prima facie evidence that such bills so paid or incurred were necessary and reasonable." Miss. Code Ann. § 41-9-119 (Rev. 2023).  "[W]hen a party takes the witness stand and exhibits bills for examination by the court and testifies that said bills were incurred as a result of the injuries complained of, they become prima facie evidence that the bills so paid or incurred were necessary and reasonable." *Graham*, 226 So. 3d at 613 (¶19) (quoting *Jackson v. Brumfield*, 458 So. 2d 736, 737 (Miss. 1984)).  "This presumption is rebuttable[;] however, to do so, more than speculation and credibility attacks must be offered." *Clark v. Deakle*, 800 So. 2d 1227, 1230 (¶13) (Miss. Ct. App. 2001).  Unless the presumption of reasonableness is successfully rebutted, medical expenses should be awarded. *Id.*

¶32.   Here, Southern presented medical bills and testified that the medical bills were incurred because of head, neck, and back injuries that resulted from the accident.  The medical bills entered into evidence consisted of a bill for an emergency room visit after the

17

accident, bills for chiropractic visits, bills for physical therapy for back pain, bills for an MRI and the interpretation of the MRI, and an MEA visit where he complained of back pain. Southern testified that he did not experience back pain or any other pain prior to the accident. No medical expert testimony was needed to conclude that Southern's medical treatment was related to the injury. Further, JPS and Younger presented no evidence to rebut Southern's proof that the bills were reasonable and resulted from the accident. In fact, only one witness testified at trial other than Southern. The one witness the defense called was responding JPD Officer Reed, who certainly could not speak to Southern's medical treatment. Therefore, the circuit court properly found that Southern was entitled to compensatory damages beyond simply the emergency room visit.

¶33. In *Graham*, Graham was taken to the hospital after a car accident and "testified that she went to several doctors because of the accident," as well as physical therapy. *Graham*, 226 So. 3d at 613 (¶20). The City of Jackson conceded that the authenticated medical bills "satisfied the issue of treatment," although the City challenged the issue of causation. *Id.* However, this Court found that "once Graham submitted the bills and records, the City had the opportunity to rebut her testimony during cross-examination regarding causation," but the City failed to "rebut any testimony proving that Graham's treatment was a result of the crash." *Id.* This Court found that the evidence supported the decision of the trial court, sitting in its role as fact-finder, that "it could not be seriously contended by the City that Graham went to the various doctors for anything other than the accident." *Id.* Therefore, "Graham did not need to proffer any testimony from an expert witness regarding causation."

18

*Id.* at (¶21). The facts outlined in *Graham* left nothing questionable relative to the analysis or disposition.

¶34. As the majority states in reciting the standard of review, "[p]roximate cause must be proved 'as a *reasonable probability*,'" which is more than "a possibility." *Crawford ex rel. Hodge v. E. Miss. State Hosp. Inc.*, 397 So. 3d 871, 877 (¶¶20-21) (Miss. Ct. App. 2024) (emphasis added) (quoting *Berryhill v. Nichols*, 171 Miss. 769, 158 So. 470, 471 (1935)). Further, when a circuit court judge sits as the trier of fact, "his findings are safe on appeal when they are supported by substantial, credible, and reliable evidence." *Id.* Southern sought treatment following the accident because he had a "stabbing short pain in [his] lower back" that did not exist before the accident. Indeed, he testified that he "didn't have *any pain* before the accident." (Emphasis added). He testified that even six years after the accident, "I'm not well. My back injury is still there, my neck injury is getting worse." While the majority takes issue with Southern's inability to understand every term in his medical records, this is not the standard. If this were the standard, a medical expert would likely be required in every case involving medical records because it is unlikely that any layperson can understand every term in a person's medical records. Rather, Southern consistently testified that he received treatment because of continuing pain from the accident, and JPS and Younger failed to rebut his testimony.

¶35. Southern testified that he sought medical treatment for head, back, and neck pain that did not exist prior to the accident, and his presentation of corresponding medical bills provided substantial evidence for the circuit court to conclude a "reasonable probability"

19

existed that his medical bills were proximately caused by the accident. JPS and Younger presented no proof to rebut Southern's testimony. Because this is a simple negligence case where no medical testimony was required to prove causation, I disagree with the majority's conclusion on this issue. *See Graham*, 226 So. 3d at 613 (¶¶19-22).

**McDONALD AND McCARTY, JJ., JOIN THIS OPINION.**

**McDONALD, J., CONCURRING IN PART AND DISSENTING IN PART:**

¶36. I concur with the majority in affirming the circuit court's finding that JPS and Younger's negligence caused the accident and in affirming the circuit court's award of $5,000 to Southern for the loss of his truck. However, I disagree with the majority in finding that Southern had not met his burden of showing that his physical injuries were caused by the accident and in reducing the circuit court's compensatory damages to a mere $339 with no award for pain and suffering. In my opinion, Southern is entitled to a significantly higher amount of compensatory damages because his injuries (including the back and neck injuries) were obviously caused by the accident, and his medical bills by my calculations totaled $10,848.98, warranting an affirmance of the circuit court's compensatory damage award *and* the award for past and present pain-and-suffering damages.

¶37. The majority has culled the medical records to identify any entry that might impeach Southern's testimony. For example, when Southern testified that he was driving a 1977 truck that had no airbag and no seat belt, the majority points to an entry in the UMMC medical record that stated Southern was a "restrained" driver, wearing a shoulder strap and seat belt. However, other entries in the UMMC records report differently. When Southern presented

20

at 5:25 p.m., the ER note stated, "Patient reports he was an unrestrained driver in a MVC today at 1515-1530." In this entry, Southern correctly reported the time of the accident to UMMC staff and is not inconsistent with a later entry the majority cites. The majority points to the UMMC record that states Southern reported that the accident occurred "six to twelve hours earlier." However, that record entry was written by a doctor who saw Southern at almost 9 p.m., which was hours after the accident. The bottom line is that the content of the medical findings and treatment in the UMMC records clearly establishes that the accident caused Southern some injury—even the majority acknowledges this.

¶38. The next medical record the majority parses is from Action Chiropractic Inc., where Southern went three days after the accident on December 1. According to Action Chiropractic's records, Southern stated that he still had headaches that he said were severe enough to wake him, and that he was also experiencing back pain, which the medical records reported as "new." At trial, Southern was specifically asked:

> Q. Before the collision what, if any, back pain were you experiencing?
>
> A. Before the collision I had none.
>
> Q. Okay. Before the collision what, if any, head pain were you experiencing?
>
> A. In my younger days I did have like small migraines when I was in elementary and high school, but as I got older it disappeared.
>
> Q. Okay. What, if any, neck pain were you experiencing before the collision?
>
> A. None.

JPS and Younger presented no evidence that Southern had any pre-existing back

21

problem—neither through any medical record or testimony.

¶39.    Moreover, the December 1, 2016 Action Chiropractic's records reflect that the examination and various tests confirmed that Southern was experiencing head, neck, and back problems in these areas *on that day*.[12]  Nor did JPS and Younger present any proof that Younger had experienced any other trauma between November 28 and December 1 that would have caused such injuries.  Moreover, it is not uncommon for an injury to be diagnosed days after an accident.  For example, in *Whittle v. Tango Transportation*, 168 So. 3d 1157, 1158-59 (¶¶2-4) (Miss. Ct. App. 2014), an employee suffered an on-the-job injury when his truck was struck from behind by a dump truck, but he did not go to the emergency room until four days later.  Yet we held that Whittle had met his burden of proof to establish that his back injury was work-related and thus compensable.  *Id.* at 1162 (¶23).  In this case, on December 1, 2016, Action Chiropractic diagnosed Southern with a sprain of ligaments of the cervical spine, cervicocranial syndrome, low back pain, radiculopathy in the lumbar region, sacroiliitis, and muscle spasm in the back three days after the accident.  Thereafter, Southern underwent treatment for those conditions three times a week, through March 2017, at a cost of over $4,000.  I doubt that any competent medical provider would treat an injury that was not needed.  Accordingly, I disagree with the majority's finding of "no obvious injuries suffered by Southern."

¶40.    Because he was still experiencing pain in his lower back and neck, Southern saw Dr.

---

[12]  For example, on the Thoracolumbar spine ROM (range of motion) test, normal active extension was thirty degrees; Southern complained of pain at five degrees.

22

Lisa Anderson at MEA Medical Clinic in Madison in October 2018.[13] She noted, "Patient is a 53-year-old M that presents today for evaluation of neck and low back pain with radiculopathy *after sustaining a motor vehicle accident.*" (Emphasis added). She noted no other pre-accident or intervening event that would have caused these injuries. She referred Southern to Genesis Physical Therapy and ultimately sent him to St. Dominic's Hospital for an MRI that was conducted on February 20, 2019, and interpreted by Dr. Bryan Gaspard, a neurologist, on March 5, 2019.[14] The record reflects that all these doctors diagnosed and treated Southern for the very conditions that Action Chiropractic documented *three days after the accident.* The majority's deep dive into the medical records to find irrelevant minutia (such as concerns about blood tests) and somehow discredit Southern is an attempt to divert attention from the fact the records establish that before the accident, Southern had no problem with his head, neck, or back, but after the accident, he suffered from these conditions for years.

¶41. Despite all this treatment, Southern testified that he still experienced pain with everything he did. He could no longer play basketball, baseball, or golf like he did before to the accident. Southern told the court that his back injury was still present, his neck injury was getting worse, his right knee was worse, and he was losing strength on the entire right

---

[13] The majority points to a November 16, 2017 MEA record where Southern denied any tingling or muscle aches. However, Southern went there for a skin infection on that date.

[14] The majority provides the findings of this MRI in paragraph 10 of its opinion. These results indicate a bulging disc and degenerative disc disease. However, it is uncontroverted that Southern was never diagnosed with bulging disc or disc disease prior to the accident, and the MRI was performed nearly two and a half years after the accident.

side of his body.

**Analysis**

¶42. Turning to the law, I point out that "[a] circuit court judge sitting as the trier of fact is given the same deference with regard to his fact finding as a chancellor, and his findings are safe on appeal when they are supported by substantial, credible, and reliable evidence." *Phillips v. City of Oxford*, 368 So. 3d 317, 323 (¶20) (Miss. 2023) (citing *City of Vicksburg v. Williams*, 294 So. 3d 599, 601 (¶11) (Miss. 2020)). "When reviewing the factual findings of the circuit court sitting as the sole trier of fact in a bench trial, we apply the substantial-evidence standard of review." *City of Jackson v. Hilton*, 324 So. 3d 1164, 1170 (¶18) (Miss. Ct. App. 2021). Therefore, we must accept the evidence that either supports or reasonably supports the trial court's finding of fact, together with all reasonable inferences which favor the circuit court's findings. *Id.* (citing *Univ. Med. Ctr. v. Martin*, 994 So. 2d 740, 747 (¶26) (Miss. 2008)). In this case, the circuit court found that Southern had proved not only negligence, but causation of his injuries warranting an award of damages. In my opinion, the evidence supports the court's findings.

*Compensatory Damages*

¶43. I agree with the majority that the law requires proof that Younger's negligence caused Southern's injuries. In *Martin v. St. Dominic-Jackson Mem'l Hosp.*, 90 So. 3d 43, 48 (¶13) (Miss. 2012), the Mississippi Supreme Court held:

> Further, this Court requires that in order to incur liability when a party is negligent, that negligence also must be the proximate cause of the injury. In order for an act of negligence to proximately cause the damage, the fact finder must find that negligence was both the cause in fact and legal cause of the

24

damage.

The Court further defined "cause-in-fact":

> *but for* the defendant's negligence, the injury would not have occurred. Stated
> differently, the cause in fact of an injury is that cause which, in natural and
> continuous sequence unbroken by any efficient intervening cause, produces the
> injury and without which the injury would not have occurred.

*Id*. at (¶14) (emphasis added). In this case, Southern entered his medical records and bills

and testified to his condition and injuries after the accident.

¶44.    Mississippi Code Annotated section 41-9-119 (Rev. 2023) provides:

> Proof that medical, hospital, and doctor bills were paid or incurred because of
> any illness, disease, or injury shall be prima facie evidence that such bills so
> paid or incurred were necessary and reasonable.

In *McCay v. Jones*, 354 So. 2d 1095, 1101 (Miss. 1978), the Mississippi Supreme Court

explained the history and purpose of the statute:

> Before the enactment of section 41-9-119, the common law was that medical
> expenses, where claimed as an element of damage, required proof connecting
> the bills for such medical expenses with the injury or disease sued on, together
> with proof that the charges for the medical expenses claimed were reasonable.
> *Bryan Bros. Packing Co. v. Grubbs*, 251 Miss. 52, 168 So. 2d 289 (1964). The
> purpose of the statute was to simplify the procedure for proving medical
> expenses where claimed as an element of damages. It permits a party to
> introduce bills for medical expenses which have been paid or incurred, upon
> the testimony of the party that the bills were incurred or paid because of the
> illness, disease or injury sued on and makes the bills prima facie evidence that
> the treatment was necessary and the charges therefor were reasonable.

In *Estate of Bolden ex rel. Bolden v. Williams*, 17 So. 3d 1069, 1071-72 (¶10) (Miss. 2009),

the Supreme Court further stated:

> This Court has held, "When a party takes the witness stand and exhibits bills
> for examination by the court and testifies that said bills were incurred as a
> result of the injuries complained of, they become prima facie evidence that the

25

bills so paid or incurred were necessary and reasonable." *Jackson v. Brumfield*, 458 So. 2d 736, 737 (Miss.1984). The opposing party may then "rebut the necessity and reasonableness of the bills by proper evidence," if desired. *Id*. If the opposing party rebuts the medical bills through proper evidence, the question is ultimately one for the jury. *Id*.

As noted, this statutory presumption of reasonableness and necessity may be rebutted with proper evidence. *Williams v. Mem'l Hosp. at Gulfport*, 233 So. 3d 824, 824 (Miss. 2015) (en banc order).

¶45. In the case at hand, the majority holds that in addition to medical records and bills, Southern was required to present testimony of a medical doctor to establish that the accident caused Southern's injuries that were not documented on the day of his accident. As support, the majority quotes *Downs v. Ackerman*, 115 So. 3d 785, 790-91 (¶18) (Miss. 2013), holding that a finding that medical bills were necessary and reasonable does not mandate a finding that they were incurred as a result of the accident. However, *Downs* further stated:

> Regarding proof of proximate cause of injuries incurred in a rear-end collision, we have stated that
>
>> A plaintiff has the burden of proof, and must offer evidence that persuades the jury. The jury is not required to believe or trust the evidence submitted by the plaintiff, and is free to accept all, part, or none of the plaintiff's evidence. A defendant is not required to prove or rebut anything.
>> . . . .
>>
>> [*Expert opinions*] are not obligatory or binding on triers of fact but [are] advisory in nature. The jury may credit them or not as they appear entitled, weighing and judging the expert's opinion in the context of all of the evidence in the case and the jury's own general knowledge of affairs.

*Id*. at 791 (¶18) (emphasis added) (quoting *Thompson v. Nguyen*, 86 So. 3d 232, 236-37

26

(Miss. 2012). Medical expert testimony is not needed in cases that are "simple and routine," as even the other case cited by the majority notes. *Rankin v. Averitt Exp. Inc.*, 115 So. 3d 874, 879 (¶17) (Miss. Ct. App. 2013) (holding in a worker's compensation case that "unless the case is simple and routine, medical causation must prove the disability and the causal connection to employment by use of expert testimony").

¶46.    Such was the case in *City of Jackson v. Graham*, 226 So. 3d 608, 613 (¶21) (Miss. Ct. App. 2017), where this Court unanimously affirmed an award of damages based merely on the plaintiff's medical bills and testimony and did not require medical testimony on causation. In that case, as Graham was crossing a four-lane highway to enter her driveway, Jackson Police Officer Martin struck the side of her truck. *Id*. at 609 (¶¶2-4). Our decision in the case on appeal does not detail the extent of Graham's injuries but notes that she was taken to the hospital after the accident and that she went to several doctors because of the accident. *Id*. at 613 (¶20). The trial court determined "that it could not be seriously contended by the City that Graham went to the various doctors for anything other than the accident." *Id.* After calculating Graham's medical expenses, the circuit court awarded Graham $121,530.87 in damages. *Id*. at 609 (¶1). This Court affirmed, stating that proof the bills were paid or incurred was prima facie evidence that they were necessary and reasonable, citing Mississippi Code Annotated section 41-9-119. *Graham*, 226 So. 3d at 613 (¶19). We further noted that the Mississippi Supreme Court has held:

> [W]hen a party takes the witness stand and exhibits bills for examination by the court and testifies that said bills were incurred as a result of the injuries complained of, they become prima facie evidence that the bills so paid or incurred were necessary and reasonable. *Jackson v. Brumfield*, 458 So. 2d

27

736, 737 (Miss. 1984). However, the opposing party may, if desired, rebut the necessity and reasonableness of the bills by proper evidence." *Id.* "The ultimate question is then for the [fact-finder] to determine." *Id.*

*Id.* Finally, given the circumstances, we held that "*Graham did not need to proffer any testimony from an expert witness regarding causation.*" *Id.* at (¶21) (emphasis added).[15] We found this evidence sufficient because the City had an opportunity to rebut Graham's testimony regarding causation. *Id.*

¶47. Although the majority recognizes that the *Graham* opinion does not identify the nature or extent of Graham's injuries, the majority proceeds to search the appellate record of the case to find something to add to *Graham*'s facts and then limit *Graham*'s holding to those facts. However, reported opinions create law that the courts and the public rely upon, and, in my opinion, it is improper for the majority to attempt to unilaterally revise a unanimous holding eight years after our caselaw is reported by adding facts of its choosing from an unpublished appellate record and then limiting the holding to those facts. In addition, even if Graham suffered the injuries the majority cites, it appears they were not all immediately obvious on the date of the accident because the majority writes she "later" required shoulder surgery. Yet the *Graham* court, which *did* know all the facts in that record, still unanimously held that Graham did not need to present any expert medical witness on causation of any of her injuries. *Id.* at 613 (¶21).

¶48. Although we have declined to apply *Graham* in medical malpractice cases, *e.g.,*

---

[15] Graham's only witness concerning her injuries, besides herself, was the release-of-information coordinator for St. Dominic's Hospital who authenticated the medical records for the treatment Graham received. *Id.*

28

*Tobias v. Univ. of Miss. Med. Ctr.*, 282 So. 3d 1188, 1191 (¶8) & n.2 (Miss. Ct. App. 2019), *Graham* otherwise remains good law and, in my opinion, applicable in the case at hand. The majority tries to distinguish *Graham* by noting that Graham was transported by ambulance to UMMC where she was hospitalized for three days. *See* Maj. Op. ¶20. But the medical records in the instant case also reflect that Southern sought medical treatment within hours of the accident. His headache continued and then involved his neck and back, and within three days, he went for treatment for these conditions.

¶49.    Moreover, JPS and Younger presented no evidence that Southern's treatment was caused by anything other than the collision.[16] An example of such a rebuttal is found in *Herring v. Poirrier*, 797 So. 2d 797, 808 (¶35) (Miss. 2000), where the defendant presented his own expert in orthopedic surgery who testified that Herring had pre-existing back problem and that his current problems were not the result of the accident, but were due to normal aging and other factors. In the case at hand, JPS and Younger had the opportunity to rebut this presumption with proper evidence. Yet they chose not to present any rebuttal testimony on the issue of Southern's injuries, such as testimony from a medical expert who could have reviewed the records and given an opinion as to the cause of the injuries Southern claimed he suffered, as the defendant did in *Herring*. Instead, JPS and Younger relied on their cross-examination of Southern, which did not persuade the fact-finder.

---

[16] The only "proof" JPS and Younger brought out on their cross-examination of Southern concerning his medical records was a reference in one that his hip pain may have been caused by prolonged standing at work. Southern's inability to explain the medical terms "lordosis" or "sacroiliitis" did not contradict the records, which reflected that the doctors, in fact, had diagnosed him with these conditions.

¶50. Ultimately, the circuit court judge, like a chancellor or a jury, was the trier of fact and had the discretion to accept or reject the evidence presented. Where "there is conflicting testimony, the chancellor, as the trier of fact, is the judge of the credibility of the witnesses and the weight of their testimony, as well as the interpretation of evidence[, and] where it is capable of more than one reasonable interpretation, this Court will not substitute its judgment for that of the chancellor even if this Court disagrees with the chancellor on the finding of fact and might arrive at a different conclusion." *Hornsby v. Hornsby*, 353 So. 3d 507, 513 (¶21) (Miss. Ct. App. 2022) (citation omitted).

¶51. Here, the evidence established that Southern was basically healthy prior to the accident, and, as in *Graham*, "it could not be seriously contended that Southern went to the various doctors for anything other than conditions caused by the accident." From my review of the medical records, it appears that "but for the defendant's negligence, the injury would not have occurred," *Martin*, 90 So. 3d at 48 (¶13), and causation of the injuries was established. Keeping in mind our standard of review, that we must accept the evidence that either supports or reasonably supports the trial court's finding of fact, together with all reasonable inferences that favor the circuit court's findings, I find no error in the circuit court's judgment in favor of Southern and award of damages for reimbursement of the bills for the medical treatment he needed as a result of the accident and for his pain and suffering.

*Amount of Compensatory Damages*

¶52. However, I would reduce the amount of compensatory damages that the circuit court awarded. "The assessment of damages is a finding of fact, and the appellate court reviews

30

an award of damages under the clearly erroneous standard." *Greater Canton Ford Mercury, Inc. v. Lane*, 997 So. 2d 198, 206 (¶30) (Miss. 2008). "Damages awards must be supported by evidence, and such evidence must be reflected in the record if it is to be affirmed on appeal." *Journey v. Long*, 585 So. 2d 1268, 1272 (Miss. 1991) (citing *Rich ex rel. Brown v. Nevels*, 578 So. 2d 609, 617 (Miss. 1991)). The circuit court's judgment did not itemize the court's $15,000 calculation of past medical bills. However, my calculation is substantially less, $10,848.98.[17] Moreover, Southern provided no evidence that he would require future medical treatment. Even when a party testifies that he or she is seeing a doctor at the time of trial, which Southern did not, we have held that "[t]o be recoverable, damages must be shown with reasonable certainty and not left to speculation and conjecture." *Haynes v. Beckward*, 358 So. 3d 1080, 1091 (¶36) (Miss. Ct. App. 2023). In the case at hand, Southern offered no proof of the costs of any future treatment needed, and, therefore, he is entitled to damages for only the costs incurred for past medical treatment. Accordingly, I would find the circuit court erred in awarding Southern $21,120.00 in past, present, and future medical treatment damages and reduce the amount to $10,848.98 for past medical treatment alone.

¶53. I would, however, affirm the circuit court's award of $90,000 for noneconomic pain and suffering damages. We have held in jury cases that this Court "will not disturb a jury's award of damages unless its size, in comparison to the actual amount of damage, shocks the conscience." *Kirk v. Newton*, 380 So. 3d 252, 274 (¶57) (Miss. Ct. App. 2023). "Even if we

---

[17] He owed UMMC $ 399.00; Action Chiropractic $4,092.00; MEA Medical Clinic $1,239.00; Genesis Physical Therapy $1,258.11; St. Dominic's for the two bills related to the MRI $397.37 and $3,243.50; Dr. Gaspard $220.00, totaling: $10,848.98.

think the amount awarded in the verdict is liberal, we are not allowed to supplant our judgment for that of the jury unless we conclude that there was insufficient evidence to support the award of damages or that the verdict was the product of bias, passion, or prejudice." *Id*. The same deference applies to trial court judges sitting as fact-finders. While such damages are not susceptible to monetary quantification, the fact-finder has broad leeway in assessing such damages. *MIMG C Woodridge Sub LLC v. Coursem*, 356 So. 3d 1246, 1251 (¶37) (Miss. Ct. App. 2023). In reviewing such damages, we have examined, among other things, a party's injuries, pain and suffering, ongoing physical impairments, and inabilities to perform routine tasks that were possible prior to the collision. *See Miss. Dep't of Rehab. Servs. v. Butler*, 384 So. 3d 546, 557 (¶38) (Miss. Ct. App. 2024). In this case, the medical records and Southern's testimony provided evidence of his pain, ongoing physical problems over several years, and his resulting limitations. JPS and Younger did not seek a remittitur, and I see no reason to disturb the circuit court's award of noneconomic damages.

¶54. In summary, I would find that in this case, Southern's head, neck, and back injuries were documented either on the same day or within three days of the accident. He received treatment for these same conditions over the years. It is obvious that the accident caused them, and JPS and Younger presented no rebuttal evidence to show causation from another source. Accordingly, I would affirm the circuit court's award of compensatory damages but reduce it to the amounts of the bills entered into evidence for past medical treatment. I would further affirm the circuit court's full award of pain and suffering damages.

**WESTBROOKS AND McCARTY, JJ., JOIN THIS OPINION.**